# IN THE SUPREME COURT OF CALIFORNIA

OTO, L.L.C.,

Plaintiff and Appellant,

v.

KEN KHO,

Defendant and Respondent;

JULIE A. SU, as Labor Commissioner, etc.,

Intervener and Appellant.

S244630

First Appellate District, Division One
A147564

Alameda County Superior Court
RG15781961

---

August 29, 2019

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Liu, Cuéllar, Kruger, and Groban concurred.

Justice Chin filed a dissenting opinion.

---

OTO, L.L.C. v. KHO

S244630

Opinion of the Court by Corrigan, J.

Here, we again consider the enforceability of an agreement requiring arbitration of wage disputes. *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659 (*Sonic I*) concluded that such arbitration agreements are categorically unconscionable because workers waive their statutory rights to a "Berman hearing" and related procedures designed to assist in the recovery of unpaid wages. (See Lab. Code, § 98 et seq.)[1] Rather than invalidating the entire agreement, however, *Sonic I* held that while Berman protections could not be waived, any party dissatisfied with the Berman hearing's result could move the dispute to arbitration. (*Sonic I*, at pp. 669, 675.) The United States Supreme Court vacated that judgment and remanded for consideration in light of *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333 (*Concepcion*). Thereafter, we determined *Sonic I*'s categorical rule of unconscionability was preempted by the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.). (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1146 (*Sonic II*).) We held instead that an arbitration agreement is not categorically unconscionable solely because it entails a waiver of the Berman procedure. An agreement to arbitrate wage disputes can be enforceable so long as it provides an accessible

---

[1]	All statutory references are to the Labor Code unless otherwise stated.

1

and affordable process for resolving those disputes. (*Id*. at p. 1146.)

We originally granted review in this case to decide whether an arbitral scheme resembling civil litigation can constitute a sufficiently accessible and affordable process. Because the facts here involve an unusually high degree of procedural unconscionability, however, a definitive resolution of that specific question is unnecessary. Even if a litigation-like arbitration procedure may be an acceptable substitute for the Berman process in other circumstances, an employee may not be coerced or misled into accepting this trade. Considering the oppressive circumstances present here, we conclude the agreement was unconscionable, rendering it unenforceable.

## I. BACKGROUND

The relevant facts are not in dispute. Ken Kho was hired as a service technician for One Toyota of Oakland (One Toyota) in January 2010.[2] Three years later, a human resources "porter" approached Kho in his workstation and asked him to sign several documents. Kho was required to sign them immediately and return them to the porter, who waited in the workstation. It took Kho three or four minutes to sign them all. He had no opportunity to read them, nor were their contents explained. Kho's first language is Chinese. He was not given copies of the documents in either language.

One document was titled "Comprehensive Agreement— Employment At-Will and Arbitration."[3] As the Court of Appeal

---

[2] The auto dealership is licensed as OTO, L.L.C., apparently an acronym of One Toyota of Oakland.

[3] According to the parties, this agreement is essentially the same as the one involved in the *Sonic* cases. Although

observed, "Notwithstanding its designation as a 'comprehensive' employment contract, the one and one-quarter page contract is merely an arbitration clause grafted onto an acknowledgment of at-will employment."

The contract's arbitration clause is contained in a dense, single-spaced paragraph, written in a very small typeface that fills almost an entire page.[4]  Subject to limited exceptions, nearly any employment-related claim made by either party must be submitted to binding arbitration.  Class or collective proceedings are generally prohibited.  Arbitrations must be conducted before a retired superior court judge, pursuant to the California Arbitration Act (Code Civ. Proc., § 1280 et seq.), with full discovery permitted (see Code Civ. Proc., § 1283.05).  Furthermore, "[t]o the extent applicable in civil actions in California courts," the agreement requires adherence to "all rules of pleading (including the right of demurrer), all rules of

---

impossible to verify without the *Sonic* record, the assertion may be at least partially true.  Both employers are automotive dealerships and the contract appears to be a standardized form.  However, the agreements cannot be "identical," as One Toyota claims.  The *Sonic II* contract allowed either party to seek review of an award under California appellate rules of procedure.  (See *Sonic II, supra,* 57 Cal.4th at pp. 1146-1147.)  The agreement here includes no such term.  *Sonic II* did not resolve whether the agreement was substantively unconscionable.  Instead, noting that details of the arbitration process might not be reflected on the face of the agreement, the case was remanded for additional fact-finding.  (See *id.* at pp. 1147-1148.)  Here, once again, we are faced with a bare agreement.  No additional facts about One Toyota's arbitration process were developed below.

[4]     The parties dispute the precise font size.  Kho asserts it is 7 points, while One Toyota insists it is 8.5 points.  By any measure, the type is quite small.

evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure Section 631.8."[5] The allocation of arbitration costs is not addressed explicitly. Instead, the agreement refers to Code of Civil Procedure section 1284.2, which generally provides that parties to an arbitration must bear their own expenses. But the agreement also states that "controlling case law" or statutes will prevail over Code of Civil Procedure section 1284.2 if there is a conflict.

Kho's employment ended in April 2014. Several months later, he filed a complaint with the Labor Commissioner for unpaid wages. At a settlement conference before a deputy labor commissioner, One Toyota was represented by counsel; Kho appeared in propria persona. One Toyota contends its attorney demanded arbitration at the conference, presenting Kho with a copy of the signed arbitration agreement, but Kho and the Labor Commissioner dispute this account. Kho rejected One Toyota's settlement offer and requested a Berman hearing. The hearing was set in August 2015, some nine months later.

On the Friday before the Monday Berman hearing, One Toyota filed a petition to compel arbitration and stay the administrative proceedings. It did not serve these papers on Kho. On the morning of the hearing, One Toyota's attorney notified the Labor Commissioner by fax of its petition and asked that the hearing be taken off calendar. The hearing officer refused. One Toyota's attorney appeared at the scheduled time

---

[5] A motion for judgment under Code of Civil Procedure section 631.8 is the equivalent of a nonsuit motion in a court trial. (See *Ford v. Miller Meat Co.* (1994) 28 Cal.App.4th 1196, 1200.)

but left after serving Kho for the first time with the petition to compel. Proceeding without One Toyota, the hearing officer awarded Kho $102,912 in unpaid wages and $55,634 in liquidated damages, interest, and penalties. One Toyota sought to vacate the award. The Labor Commissioner intervened on Kho's behalf and opposed the motions to compel and vacate. One Toyota posted the required bond to permit de novo review of the award under Labor Code section 98.2. (See *post*, at p. 8.)

The trial court vacated the Labor Commissioner's award, concluding the hearing should not have proceeded in One Toyota's absence. The court did not compel arbitration, however. It found a high degree of procedural unconscionability attended the agreement's execution, which "created oppression or surprise due to unequal bargaining power." The court also found the agreement substantively unconscionable under *Sonic II* because it "fails to provide a speedy, informal and affordable method of resolving wage claims and has virtually none of the benefits afforded by the Berman hearing procedure." The court observed, "Contrary to the assumption that arbitration is intended to provide an inexpensive, efficient procedure to vindicate rights, the agreement in this case seeks, in large part, to restore the procedural rules and procedures that create expense and delay in civil litigation." In light of this ruling, the court declined to address the Labor Commissioner's argument that One Toyota waived its right to arbitrate by waiting too long to claim it.

The Court of Appeal reversed. Although it noted an "extraordinarily high" degree of procedural unconscionability in the agreement's execution, it concluded the agreement was not substantively unconscionable. The agreement had no objectionable terms and could be considered " 'harsh or one-

5

sided' only in comparison to the various features of the Labor Code that seek to level the playing field for wage claimants." The arbitration would be sufficiently affordable under *Sonic II* because laws external to the agreement require that employers pay both the costs of arbitration (see *Armendariz v. Foundation Health Psychcare Service, Inc.* (2000) 24 Cal.4th 83 (*Armendariz*)) and a successful claimant's reasonable attorney fees (see Lab. Code, § 218.5). Though the selected arbitration procedure is more complex than a Berman hearing, the court observed that those hearings are nonbinding and can progress, at either side's request, to a de novo proceeding in superior court. In specifying an arbitral process that resembles civil litigation, the agreement thus "anticipates a proceeding that is no more complex than will often be required to resolve a wage claim under the Berman procedures." This resolution made it unnecessary for the court to address the Labor Commissioner's cross-appeal from the order vacating her award. Finally, the court held that One Toyota did not forfeit its right to arbitrate because there was no showing of prejudice from the company's delay in seeking arbitration.

## II. DISCUSSION

### A.    *The Berman Process*

Before addressing Kho's unconscionability defense, we review the statutory procedures he waived by agreeing to arbitration. We also consider the significance of that waiver in light of *Sonic I* and *Sonic II*.

### 1.    *Statutory Procedures Available to Wage Claimants*

The Labor Code provides an administrative procedure for recovery of unpaid wages. When an employer does not pay wages as required, the employee may either: (1) file a civil

action in court, or (2) file a wage claim with the Labor Commissioner under sections 98 to 98.8. The administrative option was added in 1976 (see Stats. 1976, ch. 1190, §§ 4-11, pp. 5368-5371) and is commonly known as a "Berman" hearing.[6]

If an employee files an administrative complaint, the Labor Commissioner may either accept the matter and conduct a Berman hearing (§ 98, subd. (a)); prosecute a civil action on the employee's behalf (§ 98.3); or take "no further action . . . on the complaint" (§ 98, subd. (a)). The commissioner's staff may try to settle the complaint before holding a hearing or filing suit. (Dept. of Industrial Relations, Div. of Labor Stds. Enforcement (DLSE), Policies and Procedures for Wage Claim Processing (2012 rev.) p. 2.) Subject to extensions of time, Berman hearings must generally be held within 90 days after a matter is accepted. (§ 98, subd. (a).)

A Berman hearing is conducted by a deputy commissioner, who may issue subpoenas. (Cal. Code Regs., tit. 8, §§ 13502, 13506.) The procedure "is designed to provide a speedy, informal, and affordable method of resolving wage claims." (*Cuadra v. Millan* (1998) 17 Cal.4th 855, 858 (*Cuadra*).) Pleadings are limited to a complaint and answer. There is no discovery process. (§ 98, subd. (d).) Technical rules of evidence do not apply, and all relevant evidence is admitted "if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." (Cal. Code Regs., tit. 8, § 13502.) The hearing officer may assist the parties with cross-examination and explain issues and terms involved. (DLSE,

---

[6] The legislation was sponsored by Assemblyman Howard Berman. (*Post v. Palo/Haklar & Associates* (2000) 23 Cal.4th 942, 946.)

Policies and Procedures for Wage Claim Processing, *supra*, at p. 3.) If necessary, a translator will be provided. (*Ibid.*; see § 105, subd. (b).) The claim must be decided within 15 days of the hearing. (§ 98.1, subd. (a).)

Either party may appeal the decision to the superior court, which reviews the claim de novo. (§ 98.2, subd. (a).) An employer who appeals must post an undertaking in the amount of the award. (*Id.*, subd. (b).) On appeal, the Labor Commissioner may represent claimants "financially unable to afford counsel" and must represent any indigent claimant attempting to uphold the award while objecting to no part of it. (§ 98.4.) An unappealed decision is a final judgment, enforceable immediately. (§ 98.2, subds. (d), (e).) The commissioner is responsible for enforcement (*id.*, subd. (i)), which is entitled to court priority (*id.*, subd. (e)).

If an employer's appeal fails, the court determines costs and reasonable attorney fees incurred by the successful employee and orders payment by the losing appellant. (§ 98.2, subd. (c).) Claimants represented by the commissioner may still recover fees, consistent with the statute's goal of discouraging unmeritorious appeals. (*Lolley v. Campbell* (2002) 28 Cal.4th 367, 376-378 (*Lolley*).) "An employee is successful if the court awards an amount greater than zero." (§ 98.2, subd. (c).) The statute provides a one-way fee-shifting scheme: An unsuccessful employer must pay attorney fees but a successful one may not recover them. (See *Arias v. Kardoulias* (2012) 207 Cal.App.4th 1429, 1435.) This fee scheme differs from wage

claims brought in superior court, where the "prevailing party" may obtain attorney fees. (§ 218.5, subd. (a).)[7]

The Berman process is optional for both claimants and the Labor Commissioner. Aggrieved employees may take their wage claims directly to superior court. (See § 218.) Likewise, the commissioner may decline to act on a filed complaint. (See § 98, subd. (a).) However, Berman procedures can significantly reduce the costs and risks of pursuing a wage claim. They provide "an accessible, informal, and affordable" avenue for employees to seek resolution, with assistance available if necessary. (*Sonic II*, *supra*, 57 Cal.4th at p. 1129.) They discourage unmeritorious appeals through a bond requirement and a fee-shifting scheme that favors employees. (See *id*. at p. 1130.) They permit the commissioner to represent claimants on appeal and facilitate award collection. (See *ibid*.)

2. *The* Sonic I *and* Sonic II *Decisions*

*Sonic I* and *Sonic II* addressed the validity of predispute agreements requiring wage claim arbitration. *Sonic I* held that it is against public policy for an employer to require employees to waive their Berman rights as a condition of employment, and that an arbitration agreement effectively waiving Berman rights is substantively unconscionable as a matter of law. (*Sonic*

---

[7] As amended in 2013, section 218.5, subdivision (a) provides that "if the prevailing party in the court action is not an employee, attorney's fees and costs shall be awarded pursuant to this section only if the court finds that the employee brought the court action in bad faith." (Stats. 2013, ch. 142, § 1) Although it does not guarantee that wage claimants will be able to recover their attorney fees, this amendment largely eliminates the risk that they will be liable for their employer's fees.

*I*, *supra*, 51 Cal.4th at pp. 684-687.) However, in construing the agreement to attempt to harmonize the competing policies at issue, *Sonic I* also held that parties could proceed to binding arbitration *after* they had completed a Berman hearing. (*Id.* at p. 675.) In other words, instead of pursuing a de novo appeal in superior court, a party dissatisfied with the Labor Commissioner's ruling could petition to compel arbitration. (*Id.* at p. 676.)

*Sonic I*'s holdings were short-lived. Two months later, on a related question, *Concepcion*, *supra*, 563 U.S. 333 abrogated our holding from *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 that class arbitration waivers in consumer contracts are unconscionable. (*Concepcion*, at pp. 341-344.) The high court explained that the "overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." (*Id.* at p. 344.) Because *Discover Bank*'s classwide arbitration rule interfered with the "fundamental attributes of arbitration," such as efficiency and informality, it was preempted as inconsistent with the FAA. (*Concepcion*, at p. 344.) Thereafter, the court vacated the *Sonic I* judgment and remanded for our consideration in light of *Concepcion*. (*Sonic-Calabasas A, Inc. v. Moreno* (2011) 565 U.S. 973.)

On remand, we acknowledged the Supreme Court's admonition that states "cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." (*Concepcion*, *supra*, 563 U.S. at p. 351; see *Sonic II*, *supra*, 57 Cal.4th at p. 1141.) Because the court identified efficiency as a hallmark of arbitration under the FAA, *Concepcion* taught that "courts cannot impose unconscionability rules that interfere with arbitral efficiency, including rules

forbidding waiver of administrative procedures that delay arbitration." (*Sonic II*, at p. 1141; see *Concepcion*, at pp. 344-345.) Accordingly, *Sonic I*'s categorical rule prohibiting a waiver of Berman procedures was preempted. (*Sonic II*, at pp. 1139-1141.)

Nevertheless, we noted that unconscionability remains a valid defense to enforcement, even after *Concepcion*. The overarching unconscionability question is whether an agreement is imposed in such an unfair fashion and so unfairly one-sided that it should not be enforced. Arbitration agreements could not be deemed categorically unconscionable simply because they entail a waiver of the Berman proceedings. (*Sonic II*, *supra*, 57 Cal.4th at p. 1146.) However, we provided that an employee's Berman waiver, while not dispositive, remains a significant factor in considering unconscionability. An agreement's failure to "provide an employee with an accessible and affordable arbitral forum for resolving wage disputes may support a finding of unconscionability. As with any contract, the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms as well as the circumstances of its formation to determine whether the overall bargain was unreasonably one-sided." (*Ibid*.)

The *Sonic II* majority opinion focused repeatedly on the need for accessible and affordable arbitration, reasoning that these were key benefits of the Berman process that parties to an arbitration agreement had decided to forgo. We stopped short of defining the requirements for an acceptable arbitration framework, however, and emphasized that arbitration can be structured in various ways "so that it facilitates accessible, affordable resolution of wage disputes," without necessarily replicating Berman protections. (*Sonic II, supra*, 57 Cal.4th at

p. 1147.) So long as the arbitral procedure is relatively "low-cost" (*ibid*.) and provides a forum for wage claimants "to pursue their claims effectively" (*ibid*.), its adoption in lieu of the Berman process will not, in itself, be considered unconscionable (*id*. at pp. 1147-1148). In short, when an adhesion contract requires arbitration, "the unconscionability inquiry focuses on whether the arbitral scheme imposes costs and risks on a wage claimant that make the resolution of the wage dispute inaccessible and unaffordable," thus effectively blocking every forum for redress including arbitration itself. (*Id*. at p. 1148.)

We did not decide whether the *Sonic II* agreement was substantively unconscionable under this standard. Recognizing that unconscionability is a fact-specific defense, we remanded for the trial court to examine additional evidence regarding the particulars of the arbitration process set out in the agreement. (*Sonic II*, *supra*, 57 Cal.4th at pp. 1147-1148.)

B. *Unconscionability of the Arbitration Agreement*

California law strongly favors arbitration. Through the comprehensive provisions of the California Arbitration Act (Code Civ. Proc., § 1280 et seq.), "the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.'" (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 (*Moncharsh*).) As with the FAA (9 U.S.C. § 1 et seq.), California law establishes "a presumption in favor of arbitrability." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971.) An agreement to submit disputes to arbitration "is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281; see 9 U.S.C. § 2.)

" '[G]enerally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening' the FAA" or California law. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246 (*Pinnacle*); see *Concepcion*, *supra*, 563 U.S. at p. 339.) Unconscionability can take different forms depending on the circumstances and terms at issue. However, the doctrine's application to arbitration agreements must rely on the same principles that govern all contracts. (*Sonic II*, *supra*, 57 Cal.4th at p. 1133.) The degree of unfairness required for unconscionability must be as rigorous and demanding for arbitration clauses as for any other contract clause. (*Ibid.*)

The general principles of unconscionability are well established. A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. (*Sonic II*, *supra*, 57 Cal.4th at p. 1133.) Under this standard, the unconscionability doctrine " 'has both a procedural and a substantive element.' " (*Ibid.*) "The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided." (*Pinnacle, supra*, 55 Cal.4th at p. 246.)

Both procedural and substantive unconscionability must be shown for the defense to be established, but "they need not be present in the same degree." (*Armendariz, supra*, 24 Cal.4th at p. 114.) Instead, they are evaluated on " 'a sliding scale.' " (*Ibid.*) "[T]he more substantively oppressive the contract term,

the less evidence of procedural unconscionability is required to" conclude that the term is unenforceable. (*Ibid*.) Conversely, the more deceptive or coercive the bargaining tactics employed, the less substantive unfairness is required. (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 487 (*A & M Produce*); see *Carlson v. Home Team Pest Defense, Inc.* (2015) 239 Cal.App.4th 619, 635; *Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 85 (*Carmona*).) A contract's substantive fairness "must be considered in light of any procedural unconscionability" in its making. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 912 (*Sanchez*).) "The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." (*Ibid*.)

The burden of proving unconscionability rests upon the party asserting it. (*Sanchez, supra*, 61 Cal.4th at p. 911; *Sonic II, supra*, 57 Cal.4th at p. 1148.) "Where, as here, the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle, supra*, 55 Cal.4th at p. 236.)

1. *Procedural Unconscionability*

The Court of Appeal observed that the arbitration agreement's execution involved an "extraordinarily high" degree of procedural unconscionability. We agree.

A procedural unconscionability analysis "begins with an inquiry into whether the contract is one of adhesion." (*Armendariz, supra*, 24 Cal.4th at p. 113.) An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power "on a take-it-or-leave-it basis." (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1245 (*Baltazar*); see *Armendariz,* at p. 113.) Arbitration

14

contracts imposed as a condition of employment are typically adhesive (see *Armendariz*, at pp. 114-115; *Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695, 704), and the agreement here is no exception. The pertinent question, then, is whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required. (See *Baltazar*, at pp. 1245-1246; *Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1267-1268.) " ' "*Oppression* occurs where a contract involves lack of negotiation and meaningful choice, *surprise* where the allegedly unconscionable provision is hidden within a prolix printed form." ' " (*Pinnacle, supra*, 55 Cal.4th at p. 247, italics added; see *De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 983.) This record reveals both oppression and surprise.

"The circumstances relevant to establishing oppression include, but are not limited to (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the challenged provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney." (*Grand Prospect Partners, L.P. v. Ross Dress for Less, Inc.* (2015) 232 Cal.App.4th 1332, 1348, fn. omitted.) With respect to *preemployment* arbitration contracts, we have observed that "the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (*Armendariz, supra*, 24 Cal.4th at p. 115.) This economic

pressure can also be substantial when employees are required to accept an arbitration agreement in order to *keep* their job. Employees who have worked in a job for a substantial length of time have likely come to rely on the benefits of employment. For many, the sudden loss of a job may create major disruptions, including abrupt income reduction and an unplanned reentry into the job market. In both the prehiring and posthiring settings, courts must be "particularly attuned" to the danger of oppression and overreaching. (*Armendariz*, at p. 115; see *Baltazar*, *supra*, 62 Cal.4th at p. 1244.)

The circumstances here demonstrate significant oppression. The agreement was presented to Kho in his workspace, along with other employment-related documents. Neither its contents nor its significance was explained. One Toyota admits that Kho was required to sign the agreement to keep the job he had held for three years. Because the company used a piece-rate compensation system, any time Kho spent reviewing the agreement would have reduced his pay. Moreover, as the Court of Appeal explained, "Not only did One Toyota provide no explanation for its demand for his signature, it selected a low-level employee, a 'porter,' to present the Agreement, creating the impression that no request for an explanation was expected and any such request would be unavailing." By having the porter wait for the documents, One Toyota conveyed an expectation that Kho sign them immediately, without examination or consultation with counsel. One Toyota protests that Kho did not ask questions about the agreement, but there is no indication that the porter had the knowledge or authority to explain its terms. (See *Carmona*, *supra*, 226 Cal.App.4th at pp. 84-85.) Similarly, although One Toyota is correct that Kho did not attempt to negotiate, a

complaining party need not show it tried to negotiate standardized contract terms to establish procedural unconscionability. (*Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 244; see *Sanchez*, *supra*, 61 Cal.4th at p. 914.) By its conduct, One Toyota conveyed the impression that negotiation efforts would be futile. Finally, Kho was not given a copy of the agreement he had signed.[8]

The facts also support the trial court's finding of surprise. The agreement is a paragon of prolixity, only slightly more than a page long but written in an extremely small font. The single dense paragraph covering arbitration requires 51 lines. As the Court of Appeal noted, the text is "visually impenetrable" and "challenge[s] the limits of legibility."

The substance of the agreement is similarly opaque. The sentences are complex, filled with statutory references and legal jargon. The second sentence alone is 12 lines long. The arbitration paragraph refers to: the California Fair Employment and Housing Act; title VII of the Civil Rights Act of 1964; other unspecified "local, state or federal laws or regulations"; the National Labor Relations Act; the California Workers' Compensation Act; "California Small Claims" actions; the Department of Fair Employment and Housing; the Employment Development Department; the "Equal Opportunity Commission"; the federal and California

---

[8] Nor was Kho offered a version to read in his native language. (See *Subcontracting Concepts (CT), LLC v. De Melo* (2019) 34 Cal.App.5th 201, 211; *Carmona*, *supra*, 226 Cal.App.4th at p. 85.) However, because the record does not reveal the level of Kho's English proficiency, we cannot determine the significance of this omission, and we do not rely on it.

arbitration acts; and six different sections of California's Civil Code and Code of Civil Procedure. A layperson trying to navigate this block text, printed in tiny font, would not have an easy journey.

With respect to arbitration costs, the agreement states: "If CCP § 1284.2 conflicts with other substantive statutory provisions or controlling case law, the allocation of costs and arbitrator fees shall be governed by said statutory provisions or controlling case law instead of CCP § 1284.2." Code of Civil Procedure section 1284.2 states a default rule that, unless the agreement specifies otherwise, parties to an arbitration will bear their own expenses. However, *Armendariz* created an exception to this general rule for arbitrations of employment-related disputes. (See *Armendariz*, *supra*, 24 Cal.4th at pp. 110-111.)[9] Although the agreement anticipates that the "controlling case law" of *Armendariz* would prevail over the statutory default rule, One Toyota's obligation to pay arbitration-related costs would not be evident to anyone without legal knowledge or access to the relevant authorities. It is difficult to envision that Kho would have had any idea what the cited code section says or that a 13-year-old case creates a relevant exception to it. This example illustrates the difficulty a layperson would have in

---

[9] Under *Armendariz*, "when an employer imposes mandatory arbitration as a condition of employment, the arbitration agreement or arbitration process cannot generally require the employee to bear any *type* of expense that the employee would not be required to bear if he or she were free to bring the action in court." (*Armendariz*, *supra*, 24 Cal.4th at pp. 110-111.) *Armendariz* concerned claims under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), but One Toyota does not dispute that its holding applies equally to wage claims.

deciphering key terms. It would have been nearly impossible to understand the contract's meaning without legal training and access to the many statutes it references. Kho had neither. Under these circumstances, Kho's signature attesting to have read and understood the agreement appears formulaic rather than informed. We agree with the Court of Appeal that the agreement appears to have been drafted with an aim to thwart, rather than promote, understanding.

The document itself and the manner of its presentation did not promote voluntary or informed agreement to its terms. "Arbitration is favored in this state as a voluntary means of resolving disputes, and this voluntariness has been its bedrock justification." (*Armendariz*, *supra*, 24 Cal.4th at p. 115; see *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 252.) Arbitration contracts are vigorously enforced out of respect for the parties' mutual and voluntary agreement to resolve disputes by this alternative means. (See, e.g., *Moncharsh*, *supra*, 3 Cal.4th at pp. 10-11.) However, an inference of voluntary assent can be indulged only so far and must yield in the face of undisputed facts that undermine it. Where an employee is induced to sign an arbitration agreement through "sharp practices" and surprise (see *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469 (*Gentry*)),[10] the consent rationale carries less force. "[A]rbitration 'is a matter of consent, not coercion.'" (*Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.* (2010) 559 U.S. 662, 681; see *Lamps Plus, Inc. v. Varela* (2019) __ U.S. __, __

---

[10] In *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 360, we recognized that *Gentry*'s holding regarding class arbitration waivers had been abrogated by United States Supreme Court precedent.

[139 S.Ct. 1407, 1415].)  On this record, it is virtually impossible to conclude that Kho knew he was giving up his Berman rights and voluntarily agreeing to arbitration instead.

2.    *Substantive Unconscionability*

Substantive unconscionability examines the fairness of a contract's terms.    This analysis "ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as ' " 'overly harsh' " ' (*Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1532), ' "unduly oppressive" ' (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 925), ' "so one-sided as to 'shock the conscience' " ' (*Pinnacle*[, *supra*,] 55 Cal.4th [at p.] 246), or 'unfairly one-sided' (*Little* [*v. Auto Stiegler, Inc.* (2003)] 29 Cal.4th [1064,] 1071.)  All of these formulations point to the central idea that the unconscionability doctrine is concerned not with 'a simple old-fashioned bad bargain' [citation], but with terms that are 'unreasonably favorable to the more powerful party.' " (*Sonic II*, *supra*, 57 Cal.4th at p. 1145.)  Unconscionable terms " 'impair the integrity of the bargaining process or otherwise contravene the public interest or public policy' " or attempt to impermissibly alter fundamental legal duties. (*Ibid*.)  They may include fine-print terms, unreasonably or unexpectedly harsh terms regarding price or other central aspects of the transaction, and terms that undermine the nondrafting party's reasonable expectations.  (*Ibid*.; see *Sanchez*, *supra*, 61 Cal.4th at p. 911.)  These examples are illustrative, not exhaustive.

Substantive terms that, in the abstract, might not support an unconscionability finding take on greater weight when imposed by a procedure that is demonstrably oppressive. Although procedural unconscionability alone does not invalidate

a contract, its existence requires courts to closely scrutinize the substantive terms "to ensure they are not manifestly unfair or one-sided." (*Gentry*, *supra*, 42 Cal.4th at p. 469.) We hold that, given the substantial procedural unconscionability here, even a relatively low degree of substantive unconscionability may suffice to render the agreement unenforceable. (*Carmona*, *supra*, 226 Cal.App.4th at p. 85; *A & M Produce*, *supra*, 135 Cal.App.3d at p. 487; see *Armendariz*, *supra*, 24 Cal.4th at p. 114.)

Kho and the Labor Commissioner do not focus on the fairness of specific, isolated terms in the agreement. Rather, they contend One Toyota's arbitral process is so inaccessible and unaffordable, considered as a whole, that it does not offer an effective means for resolving wage disputes. (See *Sonic II*, *supra*, 57 Cal.4th at p. 1146.)[11] This is a close question, which cannot be resolved in the abstract. It is important to stress that the waiver of Berman procedures does not, in itself, render an arbitration agreement unconscionable. However, a substantive unconscionability analysis is sensitive to "the context of the rights and remedies that otherwise would have been available to the parties." (*Sanchez*, *supra*, 61 Cal.4th at p. 922.) We must examine both the features of dispute resolution adopted as well as the features eliminated. (*Sonic II*, *supra*, 57 Cal.4th at p. 1146.)

---

[11] Separately, Kho asserts the agreement is unconscionable because it potentially extends to enforcement actions that may be brought by the Labor Commissioner. We do not address this new argument because, as Kho concedes, no such claims are at issue here.

As to accessibility, Kho first observes that, unlike in Berman proceedings, the agreement does not explain how to initiate arbitration. Industrial Welfare Commission (IWC) wage orders, required by law to be posted at the jobsite (Lab. Code, § 1183, subd. (d)), direct employees to contact the Labor Commissioner about wage-related violations, providing for this purpose both the Department of Industrial Relations website and a list of local labor commissioner offices. (See, e.g., IWC wage order No. 4-2001 (Cal. Code Regs., tit. 8, § 11040); IWC wage order No. MW-2019 (Cal. Code Regs., tit. 8, § 11000).) An employee can start the Berman process by filling out a simple form found on the website and in local offices. The form is rendered in many languages, and detailed instructions explain how to complete and file it. In contrast, One Toyota's agreement does not mention how to bring a dispute to arbitration, nor does it suggest where that information might be found.[12] Commercial arbitration providers, for example, frequently provide standardized forms to start the process. Employees can also contact the provider for information on claim initiation. The agreement here, however, identifies no commercial providers. In fact, it does not mention that such providers exist. It mandates that the arbitrator be a "retired California Superior Court Judge" but gives no indication how an employee might find such a person, let alone one willing to arbitrate a wage

---

[12]   A second document Kho signed the same day requires management to be notified in writing about compensation-related disputes but gives no indication such a notice would be sufficient to initiate arbitration. (See dis. opn., *post*, at p. 31.) Indeed, it would not be, since the agreement imposes no obligation on One Toyota to take any action upon receiving such a notice.

claim. Although some employees might pursue other avenues for relief and reach arbitration after encountering a motion to compel, these additional steps will inevitably increase the delay and expense involved. Other employees may be so confused by the agreement that they are deterred from bringing their wage claims at all.[13]

Kho also contends it would be difficult for an unsophisticated, unrepresented wage claimant to effectively navigate the agreement's arbitral procedure. In the Berman process, a claimant need only fill out a complaint form, possibly assisted by a deputy labor commissioner, then attend a settlement conference and, in some cases, a hearing. (See *Sonic II*, *supra*, 57 Cal.4th at p. 1128.) By contrast, in the arbitration provided for here, the complaint must be framed in a legal pleading, and the claimant must respond to discovery demands and dispositive motions. Whereas a Berman hearing is conducted by a deputy labor commissioner, who can explain terminology and assist with witness examination (see *ibid*.), the arbitration here must be conducted by a retired superior court judge, with procedures similar to a formal civil trial. Evidence must conform to technical rules of evidence, whereas all

---

[13] The dissent argues Kho could have deduced how to initiate arbitration by the agreement's reference to the California Arbitration Act. (Dis. opn., *post*, at p. 31.) While still speculative, this assertion would have more force if Kho had been given a copy of the documents he signed. It is undisputed he was not. It seems quite a stretch to assert that a mere reference to the California Arbitration Act in the "visually impenetrable" (*ante*, at p. 17) paragraph Kho was given an inadequate opportunity to review, and which he would have had to recall without his own copy to assist him, informed Kho how to initiate arbitration.

relevant evidence is typically admitted in Berman hearings. (See *ibid*.; Cal. Code Regs., tit. 8, § 13502.)[14]  Collection is also

---

[14]  At oral argument, One Toyota's counsel asserted that these procedural requirements would not apply in wage claim arbitrations because arbitrators would know to use simplified, Berman-like procedures instead.  This argument was never previously made and is contrary to One Toyota's position throughout this appeal.  In the Court of Appeal, One Toyota defended the complexity of its arbitral process by arguing that the agreement's "rules for discovery and motion practice are *expressly the same* as they would be in court—the same rules that the state legislature deemed fair enough to institute for all civil proceedings—with the only modifications noted in the four corners of the arbitration agreement and not requiring reference to any other documents."  In its briefing here, One Toyota argued that what "Kho and the Labor Commissioner . . . both truly desire is an arbitration procedure that resembles the Berman hearing process.  However, an employee is not entitled to that . . . ."  One Toyota never suggested its arbitral process did, in fact, resemble the Berman procedures.  Moreover, counsel's representation at oral argument is directly contradicted by the language of the arbitration agreement.  It states:  "*To the extent applicable in civil courts*, the following *shall apply and be observed*:  all rules of pleading (including the right of demurrer), all rules of evidence, all rights to resolution of the dispute by means of motions for summary judgment, judgment on the pleadings, and judgment under Code of Civil Procedure Section 631.8.  The arbitrator shall be vested with authority to determine any and all issues pertaining to the dispute/claims raised, any such determinations shall be based solely upon the law governing *the claims and defenses pleaded*, and the arbitrator may not invoke any basis (including but not limited to notions of 'just cause') for his/her determinations other than such controlling law." (Italics added.)  This language begins in the 32d line of the arbitration paragraph.  It clearly requires the parties to follow the same pleading, evidence, and motion practice rules that govern civil litigation.  Further, by requiring arbitration before a retired superior court judge, the agreement ensures the arbitrators will be experienced in

simplified in the Berman context because the Labor Commissioner is responsible for enforcing the judgment. (§ 98.2, subd. (i).) Or, if the employer unsuccessfully appeals the Labor Commissioner's award, the claimant can collect on a posted bond. (§ 98.2, subd. (b).) In arbitration, a successful claimant must petition to confirm the award and reduce it to an enforceable judgment. (Code Civ. Proc., §§ 1285, 1287.4.)

The Berman process was specifically designed to give claimants a "speedy, informal, and affordable method" for resolving wage disputes. (*Cuadra, supra,* 17 Cal.4th at p. 858.)[15] The process advances "the very objectives of 'informality,' 'lower costs,' 'greater efficiency and speed,' and use of 'expert adjudicators' that the high court has deemed 'fundamental attributes of arbitration.'" (*Sonic II, supra,* 57 Cal.4th at p. 1149; see *Concepcion, supra,* 563 U.S. at pp. 344, 348.)[16] By contrast, the arbitration provided for here

enforcing these procedural rules. It is difficult, if not impossible, to square the strict language of the contract with One Toyota's belated assertion.

[15] Although the resolution of this particular dispute has not been speedy, the delay is largely attributable to One Toyota. Kho filed a claim with the Labor Commissioner in October 2014. A settlement conference was held the next month, and a Berman hearing followed nine months later, in August 2015. The Labor Commissioner issued an award only a week after the hearing, around 10 months after Kho filed his claim. Litigation over One Toyota's motion to compel arbitration then consumed the next *four years*.

[16] The dissent raises the same criticisms of the Berman procedure that this court considered at length, and rejected, in *Sonic II, supra,* 57 Cal.4th at pages 1160-1162. The Berman procedures remain the Legislature's best "solution to the real-world problems employees face in recovering wages owed." (*Id.* at p. 1162.) These "informal procedures and incentives . . . make

incorporates the intricacies of civil litigation. An employee must surrender the benefits and efficiencies of the Berman process but does not gain in return any of the efficiencies or cost savings often associated with arbitration.

We observed in *Little v. Auto Stiegler, Inc.*, *supra*, 29 Cal.4th at page 1075, footnote 1, that litigation-like procedures, on their own, are not necessarily so one-sided as to make an arbitration agreement unconscionable. We certainly do not now suggest that a system of statutory and common law carefully crafted to ensure fairness to both sides, and subject to continuous review, is per se unfair.[17] However, that carefully crafted process can be costly, complex, and time-consuming. It is the opportunity to expedite and simplify the process that can motivate informed parties to agree to arbitration. Furthermore, *Little*'s observation was made in the context of a suit alleging wrongful demotion and discharge. (*Id.* at p. 1069.) For such

---

it more likely employees will be able to recover wages without incurring substantial attorney fees or the risk of liability for an employer's attorney fees," and help to "ensure that employees will be able to actually collect a favorable judgment." (*Ibid.*) Now, as in 2013, "[t]he dissent does not persuade us to second-guess the efficacy of this legislative solution or to depart from this court's consistent understanding of the Berman statutes' benefits." (*Ibid.*)

[17] It should be evident that our observations here, which the dissent quotes repeatedly (dis. opn., *post*, at pp. 1, 19, 42, 45, 48, 55), pertain to civil litigation in general, not to the importation of civil litigation's formalities into an arbitration scheme that was forced on an employee through oppression and surprise as a substitute for an administrative procedure that we have repeatedly found to be expedient and affordable. (See, e.g., *Sonic II*, *supra*, 57 Cal.4th at pp. 1160-1161; *Cuadra*, *supra*, 17 Cal.4th at p. 858.)

claims, it may well be that an arbitration process closely resembling civil litigation can be as advantageous for the employee as for the employer. (See *id.* at p. 1075, fn. 1.) There is no Berman-like administrative process for wrongful discharge claims.

Our cases have taken a different approach in evaluating the compelled arbitration of wage claims, as compared to the arbitration of other types of disputes. Employees who agree to arbitrate claims for unpaid wages forgo not just their right to litigate in court, but also their resort to an expedient, largely cost-free administrative procedure. We explained repeatedly in *Sonic II* that, while the waiver of Berman procedures does not in itself render an arbitration agreement unconscionable, the agreement must provide *in exchange* an accessible and affordable forum for resolving wage disputes. (*Sonic II*, *supra*, 57 Cal.4th at pp. 1146, 1147-1148, 1150.) No specific procedures are required. (See *id.* at pp. 1147, 1170-1171.) But the arbitral scheme must offer employees an effective means to pursue claims for unpaid wages, and not impose unfair costs or risks on them or erect other barriers to the vindication of their statutory rights. (See *id.* at pp. 1142, 1147-1148, 1157-1158.) When imposed in a procedurally unconscionable fashion, such barriers to the vindication of rights may become unenforceable.

It is true, as One Toyota notes, that the results of a Berman hearing are nonbinding. An appeal by either party will bring the parties to the superior court for de novo review, where litigation formalities may apply.[18] But, as *Sonic II* explained,

---

[18]  The dissent contends efficiencies of the Berman process are illusory because de novo appeals will simply bring the matters to superior court. (Dis. opn., *post*, at p. 30.) However,

the prospect of an appeal does not negate the efficiency or accessibility of the Berman process. (*Sonic II*, *supra*, 57 Cal.4th at pp. 1160-1162, 1167.) Appeals are discouraged by the requirement that employers post a bond (§ 98.2, subd. (b)) and pay the costs and attorney fees on appeal of any employee who recovers even a minimal amount (see § 98.2, subd. (c); *Lolley*, *supra*, 28 Cal.4th at p. 376). If the employer does appeal, Berman claimants who cannot afford counsel may be represented by the Labor Commissioner. Representation in a de novo appeal is guaranteed for indigent claimants who do not object to the commissioner's final order. (§ 98.4.) Absent the agreement, Kho may well have been represented by the Labor Commissioner in any de novo appeal. Moreover, all claimants will have a better understanding of how to support their wage claims as a result of having the commissioner's assistance during the Berman process.

---

the Labor Commissioner explained at oral argument that de novo appeals are relatively rare. Most of the 30,000 to 40,000 claims filed with the commissioner each year are resolved at the initial settlement conference, with only around 10,000 proceeding to a Berman hearing. Of those 10,000, fewer than 500 cases result in a de novo appeal. Moreover, although trial courts generally have the power " ' "to adopt any suitable method of practice" ' " in cases before them (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1118), the Labor Commissioner represents that de novo appeals typically proceed directly to trial, without lengthy pretrial proceedings. Formal discovery in the superior court, though permissible, is disfavored except in unusually high-value or complex wage disputes. (*Sales Dimensions v. Superior Court* (1979) 90 Cal.App.3d 757, 763.) One Toyota has not challenged these representations. (See *Madera Police Officers Assn. v. City of Madera* (1984) 36 Cal.3d 403, 407, fn. 5.)

Because the complexity of One Toyota's arbitral process effectively requires that employees hire counsel, there is also force to Kho's argument that the procedure is not an affordable option. An arbitration procedure may not impose such costs or risks on wage claimants that it " 'effectively blocks every forum for the redress of disputes, including arbitration itself.' " (*Sonic II*, *supra*, 57 Cal.4th at p. 1148.)

As noted, *Armendariz*, *supra*, 24 Cal.4th 83, requires that employers bear most arbitration costs, which, because they include the arbitrator's compensation, can be substantial. The *Armendariz* rule mitigates the unfairness of expecting that employees bear costs of a procedure to which they were required to agree. Attorney fees are different, however, because they are not unique to arbitration. It is true that employees are free to hire counsel, or not, whether they pursue their claims in court or in arbitration. But wage claimants present a somewhat special case. These employees can secure free legal assistance from the Labor Commissioner, both at the Berman hearing and in any subsequent appeal. While all employees would likely benefit from having a lawyer in the litigation-like arbitration process here, only wage claimants have to pay for representation that was otherwise available to them for free.[19]

---

[19] One Toyota suggests that the Labor Commissioner could represent claimants in arbitration. An administrative agency's authority is limited to that conferred by statute or the Constitution. (*Ferdig v. State Personnel Bd.* (1969) 71 Cal.2d 96, 103; *Noble v. Draper* (2008) 160 Cal.App.4th 1, 12.) Although section 98.4 allows the Labor Commissioner to represent indigent claimants in de novo court proceedings following a Berman hearing, no statute authorizes the representation of claimants outside this specific context. The commissioner does have the power to prosecute *its own* action for the collection of

One Toyota notes that employees who hire counsel for wage-claim arbitrations may be able to recover their legal fees under an applicable fee-shifting statute. (See *Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244, 1251.) For example, section 218.5, subdivision (a) requires the court to award reasonable attorney fees and costs to the prevailing party in "any action brought for the nonpayment of wages" if fees are requested "upon the initiation of the action." The parties do not dispute that section 218.5 applies to most of Kho's claims. While section 218.5 permits an award of fees to either employees or employers who prevail (see *Kirby*, at p. 1251), employers may recover fees "only if the court finds that the employee brought the court action in bad faith." (§ 218.5, subd. (a); see *Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 19 Cal.App.5th 525, 545.)

Although section 218.5 may mitigate some financial burden, employees still face a risk that they will not be designated the prevailing party, rendering their fees unrecoverable. The prevailing party is the one that succeeds "on a ' "practical level" ' " and has " 'realized its litigation objectives.' " (*Sharif v. Mehusa, Inc.* (2015) 241 Cal.App.4th 185, 192.) An employer might be deemed the prevailing party on a wage claim if the jury denies most or all of the wages sought, even if the employee prevails on other claims. (See *ibid.*)

---

unpaid wages and penalties on behalf of workers who are unable to afford counsel. (§ 98.3; see § 98, subd. (a).) Whether this discretionary authority extends to representing wage claimants in an arbitration is not readily apparent but, in any event, is a question beyond the scope of this appeal.

In contrast, the Berman statutes provide fee-shifting to wage claimants who secure *any* monetary recovery in an employer's appeal. (§ 98.2, subd. (c).) Considering the simplified administrative procedures that can be navigated in propria persona, and the availability of the Labor Commissioner's representation and favorable fee-shifting in a de novo appeal, claimants can successfully complete the Berman process without paying a cent to an attorney. The calculus is significantly different for employees in the arbitration process here, despite section 218.5. Assuming they can find counsel willing to represent them in One Toyota's complex arbitral process, these employees will have to pay the attorney if they do not prevail and may have to pay their employer's attorney fees upon a finding of bad faith. (See § 218.5, subd. (a).) Moreover, since section 218.5, subdivision (a) requires a fee request "upon the initiation of the action," employees who hire counsel after filing suit or starting arbitration may unwittingly forfeit their right to fees by failing to make a timely request.

Because the arbitration process here is no more complicated than ordinary civil litigation, it might be sufficiently accessible for wage claimants who are sophisticated, or affordable for those able to hire counsel. But an unconscionability analysis must be sensitive to context. Context includes both the commercial setting and purpose of the arbitration contract and any procedural unconscionability in its formation. (*Sanchez*, *supra*, 61 Cal.4th at pp. 911-912.) As noted, the procedural unconscionability showing here is exceptionally strong. Although the same contract terms might pass muster under less coercive circumstances, a worker who is required to trade the Berman process for arbitration should at least have a reasonable opportunity to understand the bargain

he is making. Had One Toyota set out the terms of its agreement in a legible format and fairly understandable language, or had it given Kho a reasonable opportunity to seek clarification or advice, this would be a different case.

Ultimately, the question is whether Kho, through oppression and surprise, was coerced or misled into making an unfair bargain. (See *Gentry, supra,* 42 Cal.4th at pp. 469-470; see also *Sanchez, supra,* 61 Cal.4th at p. 912.) The substantive fairness of this particular agreement must be considered in terms of what Kho gave up and what he received in return. By signing the agreement, Kho surrendered the full panoply of Berman procedures and assistance we have described. What he got in return was access to a formal and highly structured arbitration process that closely resembled civil litigation *if* he could figure out how to avail himself of its benefits and avoid its pitfalls. Considering the unusually coercive setting in which this bargain was entered, we conclude it was sufficiently one-sided as to render the agreement unenforceable.[20]

### 3. *Consistency with Federal Law*

Our holding rests on generally applicable unconscionability principles and heeds *Concepcion*'s counsel that arbitration agreements be placed "on an equal footing with other contracts." (*Concepcion, supra,* 563 U.S. at p. 339.) Nevertheless, our dissenting colleague renews several of the preemption arguments he made in *Sonic II*, insisting once again that this court's approach to unconscionability contradicts the FAA and United States Supreme Court jurisprudence. (See

---

[20] In light of this conclusion, we need not decide the Labor Commissioner's claim, raised below, that One Toyota forfeited its right to arbitrate.

*Sonic II*, *supra*, 57 Cal.4th at pp. 1184-1192 (conc. & dis. opn. of Chin, J.).) We respectfully suggest these complaints are unfounded.

The dissent's primary objection is that our analysis evinces hostility to arbitration, discriminates against arbitration, or improperly prefers a nonarbitral forum. (Dis. opn., *post*, at pp. 44-49.) Yet arbitration is premised on the parties' mutual consent, not coercion (see *Stolt-Nielsen S. A. v. AnimalFeeds Int'l Corp.*, *supra*, 559 U.S. at p. 681), and the manner of the agreement's imposition here raises serious concerns on that score. Moreover, we have repeatedly stressed that the substantive unconscionability of an arbitration agreement "is viewed in the context of the rights and remedies that otherwise would have been available to the parties." (*Sanchez*, *supra*, 61 Cal.4th at p. 922, citing *Sonic II*, *supra*, 57 Cal.4th at pp. 1146–1148.) The dissent supports its claim with repeated quotations to our observations about *civil litigation*, not the arbitral process under review. The argument is thus premised on a false equivalence between the system of civil litigation and the complex arbitral procedure adopted in this case, which features few, if any, of the benefits typically associated with arbitration and regarded as fundamental. (See *Concepcion*, *supra*, 563 U.S. at pp. 344-345.) While "the Berman statutes promote the very objectives of 'informality,' 'lower costs,' 'greater efficiency and speed,' and use of 'expert adjudicators' that the high court has deemed 'fundamental attributes of arbitration,' " the arbitration agreement here undermines those objectives by causing an "increase in cost, procedural rigor, complexity, or formality." (*Sonic II*, *supra*, 57 Cal.4th at p. 1149, quoting *Concepcion*, *supra*, 563 U.S. at p. 348.)

In comparing Berman's administrative process with One Toyota's arbitral procedure, we have simply evaluated the bargain at issue. We have not said *no* arbitration could provide an appropriate forum for resolution of Kho's wage claim, but only that *this particular* arbitral process, forced upon Kho under especially oppressive circumstances and erecting new barriers to the vindication of his rights, is unconscionable.

Citing the protracted appellate proceedings here, the dissent also complains that evaluating unconscionability claims will erect the type of "preliminary litigating hurdle" to arbitration the high court disfavored in *American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. 228, 239. For obvious reasons, the duration of this particular litigation can hardly be considered typical. Few cases progress to appeal, and vanishingly few reach this court. More importantly, the issue here is very different from that in *Italian Colors*. Unlike the "judge-made exception to the FAA" the high court found problematic (*Italian Colors*, at p. 235), the unconscionability defense has long been recognized as a permissible ground for invalidating arbitration agreements under the FAA's savings clause. (9 U.S.C. § 2; see, e.g., *Concepcion*, *supra*, 563 U.S. at p. 339; *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687.) The FAA thus contemplates that unconscionability claims, like other state law contract defenses, will be resolved before arbitration is enforced. (See *Sonic II*, *supra*, 57 Cal.4th at p. 1167.) If the defense cannot be addressed before arbitration, then the savings clause has no meaning. The dissent also predicts delay from the case-by-case litigation of accessibility and affordability. (See dis. opn., *post*, at p. 52.) But this is an argument with the unconscionability defense itself, which is inherently fact-specific. Once again, the dissent's view

would all but eliminate the unconscionability defense to arbitration agreements, rendering the FAA's savings clause meaningless.

"Under the dissent's sweeping view of FAA preemption, no unconscionability rule may take into account the surrender of statutory protections for certain claimants, whether or not those protections interfere with fundamental attributes of arbitration." (*Sonic II, supra,* 57 Cal.4th at p. 1168.) We rejected that view in *Sonic II* and continue to do so. *Sonic II*'s "unconscionability rule does not treat arbitration agreements differently from nonarbitration agreements, does not remotely foreclose the enforceability of agreements to arbitrate wage disputes, and does not require such agreements to adopt any devices or procedures inimical to arbitration's fundamental attributes." (*Id.* at p. 1171.) Our application of that rule today fully complies with the FAA and governing law.

C.    *Status of the Labor Commissioner's Award*

As noted, the trial court granted One Toyota's motion to vacate the Labor Commissioner's award. Because the Court of Appeal concluded the parties must arbitrate their wage dispute, it did not address the Labor Commissioner's cross-appeal from the order vacating her award. We consider the issue because the status of the Labor Commissioner's award has continuing significance on remand.

As One Toyota acknowledges, the issuance of such an award has several consequences even if not reduced to an enforceable judgment. When, as here, a de novo appeal is taken, the employer must post bond in the amount of the award. (§ 98.2, subd. (b).) Employees like Kho who do not contest any aspect of the award can be represented by the Labor

Commissioner in the de novo proceedings (§ 98.4) and obtain attorney fees if they recover any amount. (§ 98.2, subd. (c); see *Lolley*, *supra*, 28 Cal.4th at p. 377.) Kho's access to these benefits on remand depends on the status of the Labor Commissioner's award.[21] A properly vacated award could make these benefits unavailable. However, it appears the order vacating the award was made in error.

On the morning of the scheduled Berman hearing, One Toyota faxed the Labor Commissioner a letter. The company explained it had filed a petition to compel arbitration and requested the hearing be taken off calendar until arbitration was complete. The Labor Commissioner refused, proceeded with the hearing in One Toyota's absence, and made an award for Kho.[22] The trial court found that One Toyota was substantially justified in refusing to participate in the Berman hearing and that enforcing the award would violate One Toyota's right to a fair administrative hearing. The procedural

---

[21] After the trial court vacated the award, One Toyota obtained an order releasing its appeal bond. Whether section 98.2, subdivision (b) requires reinstatement or the posting of a new bond is a matter the trial court may consider on remand.

[22] One Toyota argues the Labor Commissioner created a "catch-22" by asserting that One Toyota would waive its right to arbitrate if it participated in the Berman hearing. The record directly belies this claim. After One Toyota refused to participate in the hearing, the hearing officer notified it in writing: "[I]n the event that your client disagrees with the Order, Decision, or Award in this matter *you will then have the opportunity to file an appeal or compel arbitration at that time*." (Italics added.) One Toyota cites nothing in the record to support its "catch-22" assertion.

posture here requires reversal of the trial court's order granting relief from the award.

The court purportedly relied on Code of Civil Procedure section 1094.5, subdivision (b). That statute authorizes a writ of mandate if an administrative tribunal "has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) The difficulty is One Toyota did not petition for a writ of mandate. (See Code Civ. Proc., § 1094.5, subd. (a).) It simply filed a motion to vacate the award. Moreover, administrative mandate applies only to the results of "a proceeding in which *by law a hearing is required to be given. . . .*" (*Ibid.*, italics added.; see *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 598-599.) There is no requirement that a Berman hearing be held on a wage complaint. The Labor Commissioner has discretion to hold a hearing, prosecute the case in court, or take "no further action . . . on the complaint." (Lab. Code, § 98, subd. (a).) Accordingly, Berman "hearings are *not* subject to review under Code of Civil Procedure section 1094.5." (*Corrales v. Bradstreet* (2007) 153 Cal.App.4th 33, 55.)

More fundamentally, One Toyota was not entitled to relief on its motion because it failed to exhaust its administrative remedies. The Labor Code outlines two alternatives for challenging a Berman award. (See *Gonzalez v. Beck* (2007) 158 Cal.App.4th 598, 605.) First, either party can file an appeal in the superior court. (§ 98.2.) Second, a defendant who has failed to answer or appear in the Berman proceedings can apply to the Labor Commissioner for relief under Code of Civil Procedure section 473. (Lab. Code, § 98, subd. (f).) Although an application to the Labor Commissioner need not precede a de novo appeal (see *Jones v. Basich* (1986) 176 Cal.App.3d 513,

518), this administrative recourse must be sought before a motion to vacate the commissioner's decision. Section 98, subdivision (f) states: "No right to relief, including the claim that the findings or award of the Labor Commissioner or judgment entered thereon are void upon their face, shall accrue to the defendant in any court unless prior application is made to the Labor Commissioner in accordance with this chapter." (See *Gonzalez*, at pp. 605-606.) One Toyota tried to pursue both lines of attack. It filed a de novo appeal and made a motion to vacate. Because it failed to seek relief from the Labor Commissioner, however, it was barred from obtaining the latter relief. (§ 98, subd. (f).)

If One Toyota wished to halt the Berman proceedings while pursuing arbitration, it could have requested a stay. The filing of a petition to compel arbitration does not automatically stay ongoing proceedings; the party seeking arbitration must request one. (*Brock v. Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790, 1796.) Under Code of Civil Procedure section 1281.4, "[i]f an application has been made to a court of competent jurisdiction . . . for an order to arbitrate a controversy which is an issue involved in an action or proceeding pending before a court of this State and such application is undetermined, the court in which such action or proceeding is pending shall, *upon motion of a party* to such action or proceeding, stay the action or proceeding until the application for an order to arbitrate is determined . . . ." (Italics added.) One Toyota's petition to compel did, somewhat vaguely, ask the court to stay "this action," but it gave the court no opportunity to rule on its request. The petition was filed with the court on the Friday before a Monday Berman hearing. One Toyota did not ask the court for an emergency stay in light of its late filing,

and no stay order was actually issued before One Toyota's counsel unilaterally left the hearing.

One Toyota argues the terms of Code of Civil Procedure section 1281.4 do not apply because Berman proceedings are not "pending before a court of this State." This assertion undermines One Toyota's attempt to excuse its nonparticipation in the hearing and ignores the rule from *Brock* that a motion to compel does not effect an automatic stay. Moreover, even if the language of section 1281.4 does not explicitly encompass proceedings before the Labor Commissioner, the superior court likely had the power to stay these administrative proceedings under Code of Civil Procedure section 1281.8, subdivision (a), which authorizes a range of provisional remedies in aid of arbitration, including injunctive relief. Failing that, the court could have issued a stay under its inherent power. "[A] court ordinarily has inherent power, in its discretion, to stay proceedings when such a stay will accommodate the ends of justice." (*People v. Bell* (1984) 159 Cal.App.3d 323, 329.) As the court in *Landis v. North American Co.* (1936) 299 U.S. 248, 254 explained, "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."

One Toyota did not obtain a stay, but simply refused to participate in a hearing that had been set months before. Under these circumstances, the Labor Commissioner did not act improperly in proceeding with the hearing after One Toyota and its counsel chose to depart. Vacating that award was error. Nevertheless, One Toyota properly appealed the award under section 98.2, which forestalled the Labor Commissioner's decision, terminated her jurisdiction, and vested jurisdiction in

the superior court.  (*Murphy v. Kenneth Cole Productions, Inc.*, *supra*,  40 Cal.4th at p. 1116.)  Although the appeal terminates the commissioner's jurisdiction, Kho will have the benefit of the Labor Code's post-Berman hearing protections on remand.  (See §§ 98.2, 98.4.)

## III.  DISPOSITION

The decision of the Court of Appeal is reversed.  The matter is remanded for return to the trial court for proceedings on One Toyota's de novo appeal from the Labor Commissioner's award.


**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

OTO, L.L.C. v. KHO

S244630


Dissenting Opinion by Justice Chin


Today, the majority holds that an arbitration agreement is substantively unconscionable — and therefore unenforceable — precisely *because* it prescribes procedures that, according to the majority, have been "carefully crafted to ensure fairness to both sides." (Maj. opn., *ante*, at p. 25.) If you find that conclusion hard to grasp and counterintuitive, so do I. It is based on the majority's view that arbitration with such procedures, though not unaffordable or inaccessible in the abstract or "per se unfair" (maj. opn., *ante*, at p. 25), is not as advantageous for employees with unpaid wage claims as the potentially multitiered, multistep, combined administrative and judicial statutory process known as the Berman procedure. I believe the majority's analysis and conclusion to be incorrect under state law in numerous respects. I also believe the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.), as authoritatively construed in binding United States Supreme Court decisions, precludes the majority from invalidating this arbitration agreement based on its subjective view that, for the purpose of "vindicati[ng]" employees' "statutory rights," the prescribed arbitration procedure is not as effective as the statutory Berman procedure. (Maj. opn., *ante*, at p. 25.) I therefore dissent.

## DISCUSSION

To explain why I do not join the majority, I begin by summarizing relevant state law unconscionability principles. I

then explain my disagreement with the majority's view that "a relatively low degree of substantive" unfairness may be sufficient to render an arbitration agreement unenforceable on the grounds of unconscionability (maj. opn., *ante*, at p. 20), and with the majority's analysis of procedural and substantive unconscionability. Finally, I explain why I believe the majority's analysis and conclusion are inconsistent with, and therefore preempted by, the FAA, as the United States Supreme Court has construed that law.

## A. State Law Principles of Arbitration and Unconscionability.

Several state law legal principles must guide our analysis. First, as the majority acknowledges, "California law strongly favors arbitration." (Maj. opn., *ante*, at p. 12.) The clearest expression of this state policy appears in Code of Civil Procedure section 1281, which declares that "[a] written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." This section establishes the "fundamental policy" of California's arbitration scheme: "that arbitration agreements will be enforced *in accordance with their terms*." (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 836, fn. 10.) It creates "a presumption in favor of arbitrability [citation] and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971-972.) The majority, after briefly mentioning arbitration's favored status under state law early in its opinion,

essentially ignores this principle in its analysis and in its refusal to enforce the arbitration agreement here.

Second, although the doctrine of unconscionability, as a generally applicable contract defense, may be applied to invalidate an arbitration agreement, as the majority notes, the doctrine's "application" in the arbitration context "must rely on the same principles that govern all contracts," and "[t]he degree of unfairness required for unconscionability must be as rigorous and demanding for arbitration clauses as for any other contract clause." (Maj. opn., *ante*, at p. 13.)

Third, under our generally applicable principles of unconscionability, "[a] party cannot avoid a contractual obligation merely by complaining that the deal, in retrospect, was unfair or a bad bargain" (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 911 (*Sanchez*)) or by showing that the contract "gives one side a greater benefit" (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 246 (*Pinnacle*)). Under state law, "[n]ot all one-sided contract provisions are unconscionable" (*Sanchez*, at p. 911), and even the "fact that the bargain is a very hard or unreasonable one is not generally sufficient *per se* to induce . . . courts to interfere" (*Boyce v. Fisk* (1895) 110 Cal. 107, 116). Instead, the party seeking to invalidate an arbitration agreement must show "a substantial degree of unfairness *beyond 'a simple old-fashioned bad bargain.'* " (*Sonic–Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1160, italics added (*Sonic II*).) The contract "must be 'so one-sided as to "shock the conscience" ' " (*Pinnacle*, at p. 246), or, as alternatively formulated, " '*overly* harsh,' '*unduly* oppressive,' [or] '*unreasonably* favorable.' " (*Sanchez*, at p. 911.)

Fourth, "contracts of adhesion . . . are indispensable facts of modern life" and "are generally enforced" even though they "contain a degree of procedural unconscionability." (*Gentry v. Superior Court* (2007) 42 Cal.4th 443, 469 (*Gentry*); see *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333, 346-347 (*Concepcion*) ["the times in which consumer contracts were anything other than adhesive are long past"].) "[A] contract of adhesion is fully enforceable according to its terms" unless it violates the "reasonable expectations of the weaker or 'adhering' party" or is "unduly oppressive or 'unconscionable.' " (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 819, 820 (*Graham*).)

Fifth, the party seeking to avoid the contract must establish *both* procedural and substantive unconscionability, "the former focusing on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power, the latter on ' "overly harsh" ' or ' "one-sided" ' results." (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 114 (*Armendariz*).) Although both must be present, we have stated that "they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*)

## B. The Majority's Sliding Scale.

At this point, I note my first concern about the majority's analysis:  its assertion that "a relatively low degree of

substantive unconscionability may suffice to render" an arbitration agreement "unenforceable" if the level of procedural unconscionability is "substantial." (Maj. opn., *ante*, at p. 20.) To begin with, it is unclear what the majority means by "relatively low" (*ibid.*), and the majority sheds no light on this question. The majority's unadorned and unexplained assertion inevitably poses — but does not answer — the following questions: Low "relative[]" to what, and how "low" is enough?

Nor do our precedents support or give meaning to the majority's statement. The only decision from this court the majority cites for its assertion is *Armendariz*. (Maj. opn., *ante*, at p. 21.) However, the majority notably precedes this citation with a "see" signal, which is the signal we use to introduce decisions that provide only "weaker support" for a given proposition, i.e., decisions that, as here relevant, "only indirectly support the text" or contain "supporting dicta." (Cal. Style Manual (4th ed. 2000) § 1:4, p. 9.) Clearly, then, the majority itself does not believe that *Armendariz* provides more than indirect and weak support for its view.

To the extent *Armendariz* bears on the issue, it states, as noted above, that the " 'sliding scale' " used in connection with procedural and substantive unconscionability " 'disregards the regularity of the procedural process of the contract formation . . . in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra*, 24 Cal.4th at p. 114.) As is obvious, the main point of this passage is that where the degree of *substantive* unconscionability is high — i.e., the contract terms

are extremely harsh or unreasonable — "evidence of procedural unconscionability" becomes less important, i.e., a court may " 'disregard[] the regularity of the procedural process of the contract formation' " and find the contract unconscionable based solely on the high level of substantive unfairness. (*Ibid.*) This court's use of the phrase "vice versa" at the end of the second sentence (*ibid.*) means only that evidence of procedural unfairness becomes more important to a finding of unconscionability as the degree of substantive unfairness decreases. That is not the same as saying that "a relatively low degree of substantive unconscionability may suffice" where the degree of procedural unconscionability is "substantial." (Maj. opn., *ante*, at p. 20.) Notably, the majority cites not a single case in which we have applied *Armendariz* in the manner the majority now suggests.

Indeed, the very concept of "a relatively low degree of substantive unconscionability" (maj. opn., *ante*, at p. 20) is inconsistent with our prior pronouncements that a court may not invalidate "one-sided contract provisions" upon a mere showing that "the deal, in retrospect, was unfair or a bad bargain" (*Sanchez, supra*, 61 Cal.4th at p. 911) or "gives one side a greater benefit" (*Pinnacle, supra*, 55 Cal.4th at p. 246); that the contract "must be 'so one-sided as to "shock the conscience" ' " (*Id.* at p. 246), or " '*overly* harsh,' '*unduly* oppressive,' [or] '*unreasonably* favorable' " (*Sanchez*, at p. 911); and that the party alleging unconscionability must establish "a *substantial degree of unfairness beyond 'a simple old-fashioned bad bargain'* " (*Sonic II*, 57 Cal.4th at p. 1160, italics added). The majority's assertion that "a relatively low degree of substantive unconscionability may suffice" (maj. opn., *ante*, at p.

22) simply cannot be squared with these principles, and the majority does not even attempt to do so.

For its assertion, the majority more directly relies on two Court of Appeal decisions (maj. opn., *ante*, at p. 22), but neither is persuasive. In the first — *Carmona v. Lincoln Millennium Car Wash, Inc.* (2014) 226 Cal.App.4th 74, 85 — the Court of Appeal stated: "In light of the high degree of procedural unconscionability, even a low degree of substantive unconscionability could render the arbitration agreement unconscionable." But the court cited no authority of any kind to support this bare assertion. (*Ibid.*) And the statement was dictum because, in the very next sentence, the court stated that "[t]he degree of substantive unconscionability here was *not* particularly low." (*Ibid.*, italics added.)

In the second decision the majority cites — *A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473, 487 (*A & M Produce*) — the Court of Appeal stated that the enforceability of a clause containing an "unreasonable risk reallocation[] . . . is tied to the procedural aspects of unconscionability [citation] such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated." But in making this statement, the court cited no supporting decision from either California or any other jurisdiction; indeed, it acknowledged that regarding "the importance of both" procedural and substantive unconscionability, there was "little California precedent directly on point." (*Ibid.*) Moreover, like the statement in *Carmona*, the statement in *A & M* was dictum, because the court never subsequently applied it in analyzing the unconscionability issue. In any event, read carefully, the statement says no more than did *Armendariz,* i.e., that evidence of procedural

unfairness becomes more important to a finding of unconscionability as the degree of substantive unfairness decreases. Again, that is not the same as saying that "a relatively low degree of substantive unconscionability may suffice" where the degree of procedural unconscionability is "substantial." (Maj. opn., *ante*, at p. 20.) Thus, neither *A & M* nor *Carmona* constitutes reasoned or persuasive support for the majority's view, and no published California decision has actually applied either that or a similar view to the facts of a case.

This is an important issue, because the majority's new rule will significantly impact the enforceability of virtually *all* mandatory, predispute arbitration agreements in the employment context. This court has observed that "the economic pressure" employers exert "on all but the most sought-after employees" to sign such mandatory arbitration contracts "may be particularly acute," because the contract "stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." (*Armendariz, supra*, 24 Cal.4th at p. 115; see *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1245 (*Baltazar*); *Sanchez, supra*, 61 Cal.4th at p. 919; *Sonic II, supra*, 57 Cal.4th at p. 1134; *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659, 685 (*Sonic I*); *Little v. Auto Steigler, Inc.* (2003) 29 Cal.4th 1064, 1071 (*Little*).) Given this observation, in the typical case of an employee who cannot afford to refuse or lose a job because of an arbitration requirement, even were the other procedural circumstances the majority discusses supported by the record and recognized as significant by our case law — considerations I address below — those circumstances would not make the degree of procedural unconscionability here higher

in any analytically or legally relevant sense.  Supporting this view is the fact that the majority in *Sonic I* found a "significant element of procedural unconscionability" (*Sonic I, supra*, 51 Cal.4th at p. 686) based solely on the ground that "the agreement was one of adhesion and imposed as a condition of employment" (*id.* at p. 685, fn. 10).

For this reason, the majority's assurance that an identical arbitration provision "might pass muster under less coercive circumstances" (maj. opn., *ante*, at p. 31) rings hollow.  Because of the economic pressures faced by prospective and existing employees, the majority's finding of unconscionability will surely be the rule in the vast majority of cases in the employment context, regardless of the other circumstances the majority cites.  In other words, with few exceptions, as to employees presented with a "sign or you're unemployed" choice, the ability to read, reflect, and understand the agreement does not make the situation "less coercive" in any meaningful sense. (Maj. opn., *ante*, at p. 29.)  More broadly, because it would not be difficult for a court to find a "relatively low degree of substantive" unfairness in an adhesion contract (maj. opn., *ante*, at p. 20), the majority's new rule casts significant doubt on the enforceability of many contractual terms in the employment context, not just arbitration provisions.

## C.  **Procedural Unconscionability.**

I now turn to my next point of disagreement with the majority:  its analysis of procedural unconscionability.  Several aspects of that analysis are inconsistent with both established California law and the record in this case.

First, in finding "significant oppression" (maj. opn., *ante*, at p. 16), the majority emphasizes that Kho "had no opportunity

to read" the documents his employer — plaintiff One Toyota of Oakland (OTO) — asked him to sign (maj. opn., *ante*, at p. 2), and that OTO, by having an employee from its human resources department "wait for the documents, . . . conveyed an expectation that Kho sign them immediately, without examination or consultation with counsel" (maj. opn., *ante*, at p. 16). However, in *Sanchez*, our procedural unconscionability discussion gave no weight to sworn statements of the party resisting arbitration that he " 'was presented with a stack of documents,' " " 'was simply told . . . where to sign and/or initial each one,' " and " 'was not given an opportunity to read any of [them].' " (*Sanchez, supra*, 61 Cal.4th at p. 909.) Instead, we explained that "even when a customer is assured it is not necessary to read a standard form contract with an arbitration clause, 'it is generally unreasonable, in reliance on such assurances, to neglect to read a written contract before signing it.' " (*Id.* at p. 915.) Several of our Courts of Appeal have applied this principle in the context of employment arbitration agreements. (*Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 65-66; *24-Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal.App.4th 1199, 1215.) Moreover, in *Sonic I, supra*, 29 Cal.4th at page 686, the majority's discussion of procedural unconscionability noted that "many employees may not give careful scrutiny to routine personnel documents that employers ask them to sign." These precedents are inconsistent with the majority's view that the degree of procedural unconscionability here was higher because Kho did not have an opportunity to read the documents and OTO

"conveyed an expectation that [he] sign them immediately, without examination."[1] (Maj. opn., *ante*, at p. 16.)

Second, I disagree with the majority insofar as it emphasizes that "[n]either [the] contents nor significance" of the arbitration agreement "was explained" to Kho, that "there is no indication" in the record the employee who presented the agreement "had the knowledge or authority to explain its terms," and that OTO, by "select[ing] a low-level employee . . . to present the [a]greement, creat[ed] the impression that no request for an explanation was expected and any such request would be unavailing." (Maj. opn., *ante*, at p. 16.) The majority's reliance on the *absence of evidence* regarding the employee's ability and authority to explain the agreement's terms is inconsistent with the fact that *Kho* bears "[t]he burden of proving unconscionability." (Maj. opn., *ante*, at p. 14.) More broadly, the majority's consideration of these circumstances is inconsistent with *Sanchez* and with the FAA. In *Sanchez*, regarding procedural unconscionability, we stated that the party seeking to enforce an arbitration agreement "was under no obligation to highlight the arbitration clause of its contract" and was not "required to specifically call that clause to [the other party's] attention." (*Sanchez*, *supra*, 61 Cal.4th at p. 914.) We

---

[1] The majority's emphasis on these facts is also inconsistent with its own assertions that the arbitration agreement's text is " 'visually impenetrable' " and virtually illegible (maj. opn., *ante*, at p. 17), and that its "substance" is so "opaque" (*ibid*.) that "[i]t would have been nearly impossible" for Kho "to understand the contract's meaning" (maj. opn., *ante*, at p. 18). If these assertions are accurate, then why does the majority find it significant that Kho had no opportunity to read the agreement?

also stated that "[a]ny state law imposing such an obligation would be preempted by the FAA." (*Ibid.*)

Third, I disagree that the "degree of procedural unconscionability" here was "unusually" or " 'extraordinarily high' " (maj. opn., *ante*, at pp. 2, 14) because "Kho was required to sign the agreement to keep the job he had held for three years" and OTO's conduct "conveyed the impression that negotiation efforts would be futile" (maj. opn., *ante*, at pp. 17, 18). These circumstances are what make the contract adhesive in the first place; as the majority earlier explains, "[a]n adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (Maj. opn., *ante*, at p. 14.) They are also characteristics of *all* "mandatory employment arbitration agreements," which this court has defined as "arbitration agreements that are conditions of new or continuing employment." (*Sonic II*, *supra*, 57 Cal.4th at p. 1130.) Thus, these circumstances neither distinguish this case in any way nor support a finding that there was a degree of procedural unconscionability beyond that found with any adhesive, mandatory employment arbitration agreement.

Regarding surprise, the majority begins its analysis by assailing the arbitration agreement as being "a paragon of prolixity." (Maj. opn., *ante*, at p. 17.) However, "prolixity" simply means the state or quality of being lengthy, protracted and drawn out, perhaps unduly or unnecessarily so. (12 Oxford English Dict. (2d ed.1989) p. 608; Webster's 3d New Internat. Dict. (2002) p. 1814; see Black's Law Dict. (10th ed. 2014) p. 1406, col. 1 ["prolixity" is "[t]he unnecessary and superfluous recitation of facts and legal arguments in pleading or evidence"].) It is doubtful that the arbitration agreement in this

case, consisting of a "single" paragraph with "51 lines," meets this definition, let alone constitutes a "paragon" — i.e., a perfect example — of this concept. (Maj. opn., *ante*, at p. 17.)

In any event, contrary to what the majority suggests, our cases establish that prolixity itself is *not* problematic; for purposes of a procedural unconscionability analysis, surprise " ' "occurs . . . where the allegedly unconscionable provision is *hidden* within a prolix printed form." ' " (*Pinnacle*, *supra*, 55 Cal.4th at p. 247, italics added.) There is nothing hidden about the arbitration agreement in this case. It is not buried in a multipage document that addresses numerous other matters, but appears in a relatively short document that almost exclusively addresses arbitration. In a heading at the top of the agreement's first page, set apart from the body of the agreement, the word "ARBITRATION" appears in large, bolded, all caps type. In a stand-alone provision at the top of the second page, the agreement states, in large, all caps, italicized type, that Kho is "AGREEING TO THIS BINDING ARBITRATION PROVISION." When Kho signed the arbitration agreement, he also signed a separate two-page agreement containing a stand-alone, bolded-type paragraph explaining that the parties understood and were voluntarily agreeing to resolve "any disputes" regarding Kho's employment "exclusively in accordance with binding arbitration," and setting forth some of the features of the arbitration procedure, i.e., "a retired California Superior Court Judge" will conduct the arbitration and "[t]he arbitration proceedings shall be governed by the Federal Arbitration Act, and carried out in conformity with the procedures of the California Arbitration Act." The separate agreement also expressly stated that Kho had executed or would "execute a more comprehensive arbitration agreement with the

Company." In finding surprise, the majority simply ignores these considerations, as well as precedent finding no surprise under analogous circumstances. (*Pinnacle, supra*, 55 Cal.4th at p. 247, fn. 12 [in finding no surprise, citing fact that arbitration provisions "appear in a separate article under a bold, capitalized, and underlined caption titled 'ARTICLE XVIII CONSTRUCTION DISPUTES' "]; *Bigler v. Harker School* (2013) 213 Cal.App.4th 727, 737 [no surprise where arbitration clause "located at the top of the second page in a two-page document with the heading 'Arbitration' in boldfaced font"]; *Crippen v. Central Valley RV Outlet* (2004) 124 Cal.App.4th 1159, 1165 [emphasizing that arbitration provision "was printed on a separate page" with " 'Arbitration Addendum' at the top," and "was signed separately"].)

For the preceding reasons, I conclude that the arbitration provision here is not unusual and that its substance does not contribute to a finding that the "degree of procedural unconscionability" in this case was, as the majority asserts, "unusually" and " 'extraordinarily high.' " (Maj. opn., *ante*, at pp. 2, 14.) Supporting this conclusion is the fact that in cases involving a virtually identical arbitration provision, we did not find an element of surprise that increased the degree of procedural unconscionability. (*Sonic II, supra*, 57 Cal.4th at pp. 1125-1126; *Sonic I, supra*, 51 Cal.4th at pp. 669-670; *Little, supra*, 29 Cal.4th at pp. 1069-1070.)

The majority concludes its discussion of procedural unconscionability with a line of analysis that California courts have long and uniformly rejected. The majority suggests that the arbitration agreement here is unenforceable because: (1) arbitration " ' "is a matter of consent, not coercion" ' "; and (2) we cannot "infer[]" that Kho's "consent" to arbitrate was

"voluntary," given that his execution of the arbitration agreement was "induced . . . through 'sharp practices' and surprise" and he almost certainly did not know "he was giving up his Berman rights." (Maj. opn., *ante*, at p. 19.) However, almost 40 years ago, we held that contracts of adhesion are "fully enforceable according to [their] terms" absent certain circumstances (*Graham, supra*, 28 Cal.3d at p. 819), even though they do not fit "the classical model of 'free' contracting by parties of equal or near-equal bargaining strength," given that the weaker party's only choices are " 'to adhere to the contract or reject it' " (*id*. at p. 817). About 20 years later, we held that *mandatory employment arbitration contracts* are enforceable unless they contain "one-sided, substantively unconscionable terms," even though "voluntariness" is the "bedrock justification" for arbitration and almost all employees presented with such contracts are under "acute" "economic pressure" to sign and effectively have no "choice" but to do so. (*Armendariz, supra*, 24 Cal.4th at p. 115.) In subsequent years, we have repeatedly affirmed that mandatory employment arbitration agreements are enforceable unless substantively unconscionable. (*Baltazar, supra*, 62 Cal.4th 1237, 1241; *Sonic II, supra*, 57 Cal.4th at p. 1125; *Sonic I, supra*, 51 Cal.4th at p. 677; *Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665, 677; *Little, supra*, 29 Cal.4th at pp. 1068-1069.)

Consistent with our decisions, California's Courts of Appeal have expressly rejected the majority's lack-of-consent line of analysis. For example, in *A & M Produce, supra*, 135 Cal.App.3d at pp. 486-487, the court explained: "[T]he mere fact that a contract term is not read or understood by the nondrafting party or that the drafting party occupies a superior bargaining position will not authorize a court to refuse to enforce the

contract. Although an argument can be made that contract terms not actively negotiated between the parties fall outside the 'circle of assent' which constitutes the actual agreement [citation], commercial practicalities dictate that unbargained-for terms only be denied enforcement where they are also substantively unreasonable." (Fn. omitted; see also *Franco v. Arakelian Enterprises, Inc.* (2015) 234 Cal.App.4th 947, 956 ["waivers that are obtained as a condition of employment . . . are not categorically invalid or unenforceable"]; *Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 88 ["unbargained-for term" in contract of adhesion, even if "not read or understood by the nondrafting party," is enforceable unless "*substantively unreasonable*"]; *Lagatree v. Luce, Forward, Hamilton & Scripps* (1999) 74 Cal.App.4th 1105, 1129 ["compulsory nature of a predispute arbitration agreement does not render the agreement unenforceable on grounds of coercion or for lack of voluntariness"]; *San Francisco Newspaper Printing Co. v. Superior Court* (1985) 170 Cal.App. 3d 438, 443 ["failing to read the contract is no excuse, otherwise all contracts of adhesion would be unenforceable at the whim of the adhering party"].) Insofar as the majority's analysis is contrary to this unbroken line of California authority, I disagree with it.[2]

---

[2]    To the extent the majority's FAA preemption analysis raises a similar "concern[]" about "consent" (maj. opn., *ante*, at p. 33), it is erroneous for the same reason. (See *Lamps Plus, Inc. v. Varela* (2019) __ U.S. __, __ [139 S.Ct. 1407, 1420] (dis. opn. of Ginsburg, J.) ["Arbitration clauses, the Court has decreed, may preclude judicial remedies even when submission to arbitration is made a take-it-or-leave-it condition of employment"]; *Carnival Cruise Lines, Inc. v. Shute* (1991) 499 U.S. 585, 600 (dis. opn. of Stevens, J.) ["contracts of adhesion . . . offered on a take-or-leave basis" are enforceable if reasonable,

Nevertheless, I ultimately agree there was sufficient procedural unconscionability here — given the adhesive nature of the contract and the circumstances under which OTO presented it to Kho for signature — to warrant scrutiny of the agreement's substantive unconscionability. To that issue, I now turn.

### D. Substantive Unconscionability.

The majority's analysis of substantive unconscionability is difficult to follow, largely due to its shifting approach to that issue. Initially, the majority seems to suggest that substantive unconscionability is irrelevant because there was "an unusually high degree of procedural unconscionability" here, and "an employee may not be coerced or misled into . . . trad[ing]" the Berman process for "a litigation-like arbitration procedure," "[e]ven if" that procedure "may be an acceptable substitute for the Berman process in other circumstances." (Maj. opn., *ante*, at p. 2.) Later, however, the majority expressly acknowledges that "[b]oth procedural and substantive unconscionability must be shown for the [unconscionability] defense to be established" (maj. opn., *ante*, at p. 13) and asserts that at least "a relatively low degree of substantive unconscionability" is required to void the agreement, notwithstanding "the substantial procedural unconscionability here" (maj. opn., *ante*, at p. 21). At one point,

notwithstanding argument that they cannot "justifiably be enforced . . . under traditional contract theory because the adhering party generally enters into them without manifesting knowing and voluntary consent to all their terms"].) The majority's discussion of lack of consent, though off the mark as to Kho's unconscionability claim and FAA preemption, would be apropos had Kho asserted and pursued a separate contract defense: fraud in the execution of the contract.

the majority indicates that " 'the [substantive] unconscionability inquiry focuses on whether the arbitral scheme imposes costs and risks on a wage claimant that make the resolution of the wage dispute inaccessible and unaffordable,' thus effectively blocking every forum for redress including arbitration itself." (Maj. opn., *ante*, at p. 12.)   At another point, the majority indicates that the question is whether the arbitral scheme "offer[s] employees an effective means to pursue claims for unpaid wages, and [does] not impose unfair costs or risks on them or erect other barriers to the vindication of their statutory rights."  (Maj. opn., *ante*, at p. 27.)  At still another point, the majority states that the question is whether "the bargain" between the parties "was sufficiently one-sided as to render the agreement unenforceable" (maj. opn., *ante*, at p. 32), i.e., "so unfairly one-sided that it should not be enforced" (maj. opn., *ante*, at p. 11).  Finally, shifting gears one last time, the majority declares in the final paragraph of its analysis that the substantively unconscionable "question" here "[u]ltimately" is whether the bargain was simply "unfair."  (Maj. opn., *ante*, at p. 32.)

This court's most relevant decision on the issue — *Sonic II* — is quite specific as to the applicable standard.  Under the majority opinion in that case, an agreement requiring arbitration of claims otherwise subject to the Berman procedure is not substantively unconscionable "so long as the arbitral scheme, however designed, provides employees with an accessible, affordable process for resolving wage disputes that does not 'effectively block[] every forum for the redress of [wage] disputes, including arbitration itself.' "  (*Sonic II, supra*, 57 Cal.4th at pp. 1157-1158.)   The majority here expressly acknowledges that the majority opinion in *Sonic II* "focused

repeatedly on the need for accessible and affordable arbitration" (maj. opn., *ante*, at p. 11), and that under *Sonic II*, "[a]n agreement to arbitrate wage disputes can be enforceable so long as it provides an accessible and affordable process for resolving those disputes" (maj. opn., *ante*, at pp. 1-2). Indeed, the majority even sets forth the *Sonic II* test at several points. (Maj. opn., *ante*, at pp. 12, 29). Surprisingly, however, it never applies that test; it nowhere states that arbitration under the agreement here is inaccessible or unaffordable to the point that it " 'effectively block[s] every forum for the redress of [wage] disputes, including arbitration itself.' " (*Sonic II*, at p. 1158.)

Indeed, in several ways, the majority's analysis supports the conclusion that the arbitration agreement here does *not* meet the *Sonic II* test for substantive unconscionability. To begin with, the majority concedes that that the arbitration process here — which permits "discovery" (maj. opn., *ante*, at p. 3) and calls for "the same pleading, evidence, and motion practice rules that govern civil litigation" (maj. opn., *ante*, at p. 24, fn. 14) — is no more complicated than ordinary civil litigation . . . ." (Maj. opn., *ante*, at p. 31.) Thus, arbitration under the agreement cannot be any more unaffordable or inaccessible for Kho than "ordinary civil litigation" (*ibid.*), a system that, according to the majority, has been "carefully crafted to ensure fairness to both sides" and is not "per se unfair" (maj. opn., *ante*, at p. 26). The majority also concedes that under the arbitration agreement, Kho would be entitled to "reasonable attorney fees and costs" were he to be "the prevailing party in 'any action brought for the nonpayment of wages.' " (Maj. opn., *ante*, at p. 30.) This aspect of the agreement, the majority observes, "may mitigate some financial burden" of the arbitration. (*Ibid.*)

The majority also recognizes that in *Little*, we held *in the arbitration context* that use of "litigation-like procedures" does "*not* necessarily . . . make" a mandatory employment arbitration agreement "unconscionable." (Maj. opn., *ante*, at p. 26, italics added.) Notably, in reaching this conclusion, we rejected the claim that "such procedures detract from the inherent informality of arbitration" and necessarily "inordinately benefit [employers] rather than [employees]." (*Little*, *supra*, 29 Cal.4th at p. 1075, fn. 1.) Consistent with *Little*'s analysis, the majority concedes that, for certain claims, "it may well be that an arbitration process closely resembling civil litigation can be as advantageous for the employee as for the employer." (Maj. opn., *ante*, at pp. 26-27.)

Inexplicably discarding *Sonic II*'s test for substantive unconscionability, the majority bases it conclusion on the alternative substantive unconscionability tests it sets forth. According to the majority, because "Kho surrendered the full panoply of Berman procedures and assistance," and "received" nothing "in return" but "access to a formal and highly structured arbitration process," his "bargain" with OTO was both "unfair" and "sufficiently one-sided as to render the [arbitration] agreement unenforceable." (Maj. opn., *ante*, at p. 32.)

I disagree with the majority's analysis and conclusion in several respects. Initially, as already explained, our precedents establish that for an agreement to be substantively unconscionable, it is not enough that it is merely "unfair" or "one-sided." (Maj. opn., *ante*, at p. 32.) Rather, it must cause "a substantial degree of unfairness *beyond 'a simple old-fashioned bad bargain.'* " (*Sonic II*, *supra*, 57 Cal.4th at p. 1160, italics added.) It "must be 'so one-sided as to "shock the conscience" ' " (*Pinnacle*, *supra*, 55 Cal.4th at p. 246), or, as alternatively

formulated, " '*overly* harsh,' '*unduly* oppressive,' [or] '*unreasonably* favorable.' " (*Sanchez, supra,* 61 Cal.4th at p. 911.)

Next, to the extent an evaluation of the benefits Kho relinquished and received is necessary, the majority's analysis is improperly narrow. As the majority acknowledges, " 'the unconscionability inquiry requires a court to examine the totality of the agreement's substantive terms' " and to determine the fairness of the parties' " 'overall bargain.' " (Maj. opn., *ante*, at p. 11.) Consistent with this observation, under basic contract law, "new and different consideration" is *not* required for "every individual promise in a contract." (*Martin v. World Savings & Loan Assn.* (2001) 92 Cal.App.4th 803, 809.) Instead, "one promise in a contract 'may be consideration for several counter promises.' " (*Ibid*; see *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 679 [" ' "[a] single and undivided consideration may be bargained for and given as the agreed equivalent of one promise or of two promises or of many promises" ' "].)

Viewed from this perspective, Kho received several substantial benefits "in return" for agreeing to arbitration. (Maj. opn., *ante*, at p. 29.) First and foremost, he received the benefit of continued employment. Kho was an at-will employee and, according to the majority, "was required to sign the agreement to keep [his] job." (Maj. opn., *ante*, at p. 16.) Under our precedents, Kho's " 'continuing employment' " under such circumstances constitutes " 'consideration' " from OTO that " 'support[s]' " the arbitration agreement. (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 14; see *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 638 [" 'neither party to an at-will relationship has any obligation to perform in the future, and so doing so *can* provide valuable consideration for a modification of

the contract' "].)  Second, the agreement here, considered in its entirety, is not merely a Berman waiver, but is a broad, *bilateral* arbitration provision that applies, with only a few exceptions, to "all disputes" between the parties "arising from, related to, or having any relationship or connection whatsoever with [Kho's] seeking employment with, employment by, or other association with" OTO.  It thus confers on Kho the benefits of arbitration as to claims not subject to the Berman procedure, unless it may be said there are no such benefits in *any* covered context.  The majority improperly ignores these benefits and incorrectly evaluates the arbitration agreement as if it were only "a waiver of Berman procedures."  (Maj. opn., *ante,* at p. 11.)

Moreover, under basic contract law, the receipt of a benefit is *not* the exclusive measure of consideration; "a detriment to" one party is sufficient consideration for a contract even if the other contracting party receives no "benefit for his promise." (*Westphal v. Nevills* (1891) 92 Cal. 545, 548.)  As here relevant, " '[a]ny suspension or forbearance of a legal right constitutes a sufficient consideration.' "  (*Adolph Ramish, Inc. v. Woodruff* (1934) 2 Cal.2d 190, 207.)  In this case, OTO's "promise[] . . . to arbitrate [its] disputes" with Kho and "to forego" its right to "judicial determination" of those disputes — including the right to a jury trial — "provide[d] consideration" for the agreement, as did Kho's similar promise.  (*Strotz v. Dean Witter Reynolds, Inc.* (1990) 223 Cal.App.3d 208, 216; see *Peleg v. Neiman Marcus Group, Inc.* (2012) 204 Cal.App.4th 1425, 1449 [" 'mutual promises to submit all employment disputes to arbitration constituted sufficient consideration, because both parties were bound to the promises to arbitrate' "].)

In any event, even insofar as the agreement constitutes a Berman waiver, I disagree that Kho received nothing "in return"

but "access to a formal and highly structured arbitration process." (Maj. opn., *ante*, at p. 29.) The Berman procedure is potentially a *three-step* process. First is the administrative hearing, assuming the Labor Commissioner, as a matter of discretion, accepts the matter and decides to hold a hearing. (Maj. opn., *ante*, at p. 7.) Step two is a *trial de novo* in superior court (maj. opn., *ante*, at p. 8), which either party may request without having even participated in the administrative procedure. (*Jones v. Basich* (1986) 176 Cal.App.3d 513.) This de novo proceeding is " ' "a trial anew in the fullest sense" ' " (*Post v. Palo/Haklar & Associates* (2000) 23 Cal.4th 942, 948), in which the superior court proceeds " 'as a court of original jurisdiction, with full power to hear and determine [the matter] as if it had never been before the labor commissioner' " (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1119). Thus, as the majority notes, in the de novo proceeding, "litigation formalities may apply." (Maj. opn., *ante*, at p. 26.) Moreover, the administrative decision "is 'entitled to no weight whatsoever.' " (*Post*, at p. 948) and the employer "is not bound by the defenses it raised" at the Berman hearing; it may "abandon, change, or add defenses not brought before the Labor Commissioner" (*Murphy*, at p. 1119) and may present "entirely new evidence" (*Post*, at p. 948). Step three of the Berman procedure is "a conventional appeal to an appropriate appellate court" after the trial court's decision upon the de novo hearing. (*Ibid.*)

In signing the arbitration agreement, as to claims covered by the Berman statutes, Kho gained access to a procedure with no preliminary, *nonbinding* administrative process; no potential for formal civil litigation *in court*; only limited judicial review; and *some*, but not all, of the "litigation formalities" that, as the

majority concedes, may apply in a de novo proceeding under the Berman statutes. (Maj. opn., *ante*, at p. 26.) And he gained OTO's legal commitment and obligation to pay any and all costs "unique" to this procedure. (*Armendariz, supra*, 24 Cal.4th at p. 113.) Thus, "in return" for waiving the Berman procedure, Kho received considerably more than just "access to a formal and highly structured arbitration process." (Maj. opn., *ante*, at p. 29.) The majority may think he made a " 'bad bargain' " (*Sonic II, supra*, 57 Cal.4th at p. 1160), that he "could have done better" (*id.* at p. 1148), or that the agreement " 'gives [OTO] a greater benefit' " (*id.* at p. 1160), but our precedents *preclude* us from declaring an agreement to be unconscionable and unenforceable on any of those grounds.

In an attempt to diminish the value of what Kho received and inflate the value of what he gave up, the majority asserts that the Berman procedures "discourage[]" de novo proceedings by requiring appealing employers to post undertakings and requiring unsuccessful appellants to pay the other side's costs and reasonable attorney fees. (Maj. opn., *ante*, at p. 26.) But the former requirement would seem to provide little disincentive, given that the employer's only alternative to filing an appeal and posting an undertaking is actually paying the award. And the latter provision also discourages *employees* from appealing, because it requires them to pay costs and attorney fees if they appeal and are "unsuccessful," meaning they do not obtain an "award[] . . . greater than zero." (Lab. Code, § 98.2, subd. (c).) Of course, the record here provides further reason to doubt the deterrent value of these provisions; after the administrative decision, OTO, which declined even to participate in the Berman hearing, filed for a de novo trial, completely *undeterred* by the statutes. In any event, having

provisions that assertedly provide some undetermined and factually unproven disincentive to seeking a trial de novo is not at all the same as having access to an arbitration procedure that enables Kho to eliminate even the possibility that recovery of unpaid wages will require a formal civil trial in court — with attendant "litigation formalities" (maj. opn., *ante*, at p. 27) — after a preliminary and *nonbinding* administrative procedure or as a matter of first resort in lieu of that procedure. As the majority explains, "[i]t is the opportunity to expedite and simplify the process that can motivate informed parties to agree to arbitration."[3] (Maj. opn., *ante*, at p. 26.)

---

[3]     In rejecting my analysis, the majority relies on the statement of counsel for the Labor Commissioner at oral argument that his "understand[ing]" is that there are "probably" fewer than 500 de novo proceedings per year. (See maj. opn., *ante*, at p. 27, fn. 17.) Reliance on this statement of counsel's "understand[ing]," which obviously lacks foundation and is hearsay, is improper under our " 'settled' " rule that " 'on a direct appeal from a judgment [we] will not consider matters outside the record.' " (*People v. Gardner* (1969) 71 Cal.2d 843, 854.) The majority in both *Sonic I* and *Sonic II* followed this settled rule and expressly declined to rely on factual representations about the arbitration process counsel made "[a]t oral argument" in an effort to support the arbitration agreement's validity. (*Sonic II*, *supra*, 57 Cal.4th at p. 1147; *Sonic I*, *supra*, 51 Cal.4th at p. 681, fn. 4.) It is noteworthy that the majority here ignores the rule in order to establish the arbitration agreement's *invalidity*, an issue on which Kho bears the burden of proof. The majority's inadequate response — that OTO did not "challenge[]" counsel's statement  (maj. opn., *ante*, at p. 28, fn. 18) — fails to recognize that counsel made the statement *during rebuttal argument*, *after* OTO's argument, so OTO had no opportunity to respond. In any event, the majority's response misses an essential point: By agreeing to arbitration, Kho eliminated any possibility that recovery of unpaid wages would require a formal civil trial in

The majority's view that Kho received little or nothing "in return" (maj. opn., *ante*, at p. 32) for the Berman waiver rests on numerous other exaggerations, unproven or erroneous assumptions, miscalculations, and/or mischaracterizations regarding the value of the Berman procedures. First, as the majority acknowledges, when an employee files an administrative claim, "[t]here is no [statutory] requirement that a Berman hearing be held" (maj. opn., *ante*, at p. 32) and the Labor Commissioner has "discretion to . . . take 'no further action . . . on the complaint'" (*ibid.*, quoting Lab. Code, § 98, subd. (a)). Thus, when Kho signed the arbitration agreement — which is the relevant time for assessing unconscionability (Civ. Code, § 1670.5, subd. (a)) — it was entirely speculative whether *any* of the Berman procedure's asserted benefits would be available to him, and the only thing he actually relinquished was the opportunity to *ask* the Labor Commissioner *to exercise discretion* to conduct legally nonbinding administrative proceedings on a claim.

Second, the majority's view that the Berman administrative procedure is more advantageous for employees because it has "no discovery process" (maj. opn., *ante*, at p. 7) is inconsistent with our case law. In *Armendariz, supra,* 24 Cal.4th 83, which involved a mandatory employment arbitration agreement, the majority held that "the provision of adequate discovery" is one of the "*minimum requirements*" of a valid and enforceable arbitration provision (*id.* at p. 91, italics added) and explained that "*from* [*an*] *employee's point of view*," more "limited discovery" is typically one of the "potential

court, either after a nonbinding administrative procedure or in lieu of such a procedure.

*disadvantages*" of arbitration (*id*. at p. 115, italics added). In *Gentry*, *supra*, 42 Cal.4th at page 457, the majority extended the discovery requirement to an unpaid wage claim. Kho's actions confirm this court's previous statements regarding the importance of discovery to employees with wage claims; during the administrative Berman proceedings, he "requested that a subpoena be issued for various work related documents."

Third, the Berman procedure is *not*, as the majority asserts, necessarily " 'speedy' " or "expedient." (Maj. opn., *ante*, at pp. 24, 25.) As explained above, a Berman procedure is potentially a *three-step*, combined administrative and judicial process, which may include a civil trial in court with "litigation formalities." (Maj. opn., *ante*, at p. 16.) This three-step process has the potential to substantially delay any recovery. Indeed, the first administrative step by itself can take years. (*Sonic I*, *supra*, 51 Cal.4th at p. 681, fn. 5.) [noting several "documented" cases in which it took "slightly under one year" to commence the Berman hearing, and one in which it took "slightly under four years"].) In this case, for example, the Berman hearing was not held for about 10 months after Kho filed his claim, and the Labor Commissioner's award was made some 16 months after Kho's termination. Two weeks later, OTO requested a trial de novo. (Maj. opn., *ante*, at pp. 5, 33.) Thus, nothing at the time that Kho signed the contract — and nothing that actually happened in the Berman proceedings that followed Kho's termination — supports the majority's view that, by signing the arbitration agreement, Kho gave up a " 'speedy' " or "expedient" administrative procedure. (Maj. opn., *ante*, at pp. 24, 25.) Nor is there *any* basis in the record for the majority's implicit conclusion that arbitration under the agreement here — which involves no preliminary, nonbinding

administrative process and only limited appellate review — would take longer than the Berman procedure. The majority's reliance on *factually unsupported and unproven assumptions* about the Berman procedure's speed is contrary to the fact that *Kho* bears "[t]he burden of proving unconscionability."[4] (Maj. opn., *ante*, at p. 14.)

Indeed, in light of the facts of this case and the *Sonic II* majority's discussion of this issue, the majority's steadfast reliance here on the asserted speediness of the Berman procedure is as ironic as it is legally erroneous. In *Sonic II*, I argued that the potentially three-step Berman procedure is not necessarily "speedier or more streamlined than arbitration." (*Sonic II, supra*, 57 Cal.4th at p. 1181 (conc. & dis. opn. of Chin, J.).) The majority rejected my argument, asserting it rested on "bare assertions" that had "no evidentiary support." (*Sonic II*, at p. 1167.) At the same time, the majority left the question open, "direct[ing] the trial court on remand to consider" this issue — and the claim of unconscionability — "in light of any relevant evidence." (*Sonic II, supra*, 54 Cal.4th at p. 1162.) Contrary to that admonition, the majority here dismisses the

---

[4]     The majority concedes that resolution of this case through the Berman administrative process "has not been speedy," but asserts that "the delay is largely attributable to" OTO. (Maj. opn., *ante*, at p. 25, fn. 14.) The majority offers no factual basis for this assertion, and nothing in the record supports it. For example, nothing indicates why it took several months just for Kho to receive a response from the Labor Commissioner to his request for a Berman hearing, or why the hearing was finally set for "some 9 months" after he made his request. (Maj. opn., *ante*, at p. 4.) In any event, whether OTO or a representative of the Labor Commissioner was responsible for the delay is irrelevant to my point that the Berman process is not necessarily speedy.

"relevant evidence" in the record showing that the Berman procedure is *not* speedy. (*Ibid.*) Instead of considering that evidence, the majority does precisely what the *Sonic II* majority incorrectly accused me of doing in that case: relying on "bare assertions" that have "no evidentiary support."[5] (*Sonic II*, at p. 1167.)

Fourth, the Berman procedure is not as " 'informal' " as the majority suggests. (Maj. opn., *ante*, at p. 7.) The Labor Commissioner's published policies and procedures stress that Berman hearings "are formal procedures" at which each party has the right to be represented by counsel, to present evidence, to testify under oath, to have other witnesses testify under oath, to cross-examine the opposing party and witnesses, and to subpoena witnesses, documents and records. (Dept. of Industrial Relations, Div. of Labor Stds. Enforcement (DLSE), Policies and Procedures for Wage Claim Processing (2012 rev.) pp. 2–4 (DLSE Policies).) Moreover, the judicial trial de novo procedure to which either side is entitled after a Berman

---

[5] The *Sonic II* majority was incorrect about my analysis because I expressly referenced the fact that the employer in that case had "documented" three cases in which it took "a year or more" just to commence the Berman hearing. (*Sonic II*, *supra*, 57 Cal.4th at p. 1181 (conc. & dis. opn. of Chin, J.); see *Sonic I*, 51 Cal.4th, *supra*, at p. 681, fn. 5 [petition to compel arbitration "documented" two cases in which it took "slightly under one year" to commence the Berman hearing, and one in which it took "slightly under four years"].) The *Sonic II* majority simply chose to ignore this reference and the documented evidence in the record. The majority here adopts the same head-in-the-sand approach, simply dismissing evidence that the Berman procedure is not, in reality, speedy, and relying instead on assertions about what the Berman procedure was, in theory " 'designed to provide.' " (Maj. opn., *ante*, at p. 7.)

hearing is ordinary civil litigation, including both trial in the superior court and appeal. At both judicial levels, as the majority acknowledges, "litigation formalities may apply." (Maj. opn., *ante*, at p. 26.) Thus, *all* of the features of the arbitration agreement that are problematic for the majority — a superior court judge, discovery, and rules of pleading, evidence and motion practice — are actually *built into* the Berman procedure, and then some.

The majority emphasizes that the deputy labor commissioner who conducts the Berman hearing "can explain terminology and assist with witness examination." (Maj. opn., *ante*, at p. 22.) But nothing *requires* the hearing officer to provide such help; the decision whether to do so is left to the hearing officer's "sole authority and discretion." (DLSE Policies, *supra*, at p. 3.) In any event, nothing in the arbitration agreement precludes the arbitrator from providing similar assistance, and the majority never asserts otherwise. (See *Sonic II*, *supra*, 57 Cal.4th at p. 1164 ["arbitrators have discretion to decide on features of arbitration that are not specified in the agreement"]; *Sanchez v. Western Pizza Enterprises, Inc.* (2009) 172 Cal.App.4th 154, 177 ["An arbitrator ordinarily has broad discretion with respect to the procedures and law governing the arbitration"].)

Fifth, the majority's discussion of the relative ease of initiating arbitration and the Berman procedure is faulty in several respects. The arbitration agreement is problematic for the majority because it "does not explain how to initiate arbitration." (Maj. opn., *ante*, at p. 21.) However, the second agreement Kho signed when he executed the arbitration agreement informed him that he should "notify the Dealership's General Manager in writing" if he "dispute[d] the amount of

wages paid to" him. This agreement informed Kho that all he had to do to initiate arbitration was to submit to OTO a written claim for unpaid wages. Moreover, the arbitration agreement itself expressly referenced and incorporated — by both name and specific statutory citation — the California Arbitration Act (Code Civ. Proc., § 1280 et seq.), which sets forth the petition procedure for initiating arbitration if "a party to the [arbitration] agreement refuses to arbitrate" a controversy. (Code Civ. Proc., § 1281.2.) Notably, although we dealt with similar arbitration agreements in *Sonic I*, *Sonic II*, and *Little*, in none of those decisions did we even mention their failure to explain how to initiate arbitration.

On the other side of its "initiation" equation, the majority, in relying on two wage orders of the Industrial Welfare Commission (IWC) (maj. opn., *ante*, at p. 22), is truly grasping at straws. To begin with, the majority does not suggest, and nothing in the record indicates, that these wage orders were ever handed to Koh, in his possession, or called to his attention in any way. Indeed, Kho *could not* have seen one of the wage orders, because it post-dated his employment with OTO by almost five years. (IWC Wage Order No. MW-2019.) The other order states, contrary to the majority's assertion, that posting is unnecessary "[w]here the location of work or other conditions make [posting] impractical," in which case the employer need only "keep a copy of th[e] order and make it available to every employee upon request." (IWC Wage Order No. 4-2001, § 22.) Again, the majority does not suggest, and nothing in the record indicates, that the wage order was actually posted at Kho's worksite.

Even had the wage order that actually existed when Kho worked at OTO been posted, nothing suggests Kho ever saw it,

let alone read it. And even had he read it, he surely would not have understood it if, as the majority asserts, "[i]t would have been nearly impossible" for him "to understand" the arbitration agreement's meaning given his lack of "legal training and access to" the statutes it references. (Maj. opn., *ante*, at p. 19.) To the extent, if any, the text of the *single paragraph* arbitration agreement is, as the majority asserts, " 'visually impenetrable' " (maj. opn., *ante*, at p. 17), the text of the wage order — comprising *10 pages* of densely packed, single-spaced type with 22 sections, multiple subsections, and multiple subparts to the multiple subsections — is far more visually impenetrable. And to the extent, if any, the arbitration agreement's "substance" is, as the majority asserts "opaque" (maj. opn., *ante*, at p. 17), again, the wage order's substance is far more opaque. The wage order contains *more* "statutory references and legal jargon" than the arbitration agreement, and its "legal jargon" is much more complicated than the arbitration agreement's. (Maj. opn., *ante*, at p. 17.) To borrow the words of the majority, "a layperson trying to navigate" the wage order "text would not have an easy journey." (Maj. opn., *ante*, at p. 18.) Indeed, assuming the wage order applied to Kho — something the majority does *not* actually assert — it would have been hard for him to have understood this fact even had he read it; in complexly structured, multipart sections containing highly technical "legal jargon" and many "statutory references" (maj. opn., *ante*, at p. 18), the first three pages of the wage order set forth 21 definitions and numerous coverage exemptions (Wage Order No. 4-2001, §§ 1, 2).

As for informing Kho about the Berman procedure, the wage order contains not a single mention of that procedure as a means for resolving wage disputes, either by name or by statutory reference. Nor, contrary to the majority's suggestion,

does the sentence on which the majority relies even expressly refer to "wage-related violations." (Maj. opn., *ante*, at p. 22.) It refers instead only generally to "QUESTIONS ABOUT ENFORCEMENT of the Industrial Welfare Commission orders and reports of violations." (Wage Order No. 4-2001, p. 9.) For Kho to have known that this sentence related to "wage-related violations" (maj. opn., *ante*, at p. 22), he would have needed to understand that the acts he wanted to challenge were addressed by the wage order *and* constituted violations of its complicated, legally technical provisions. Finally, the sentence in question appears *at the end* of the 10-page wage order, *after the last* of its 22 sections. (Wage Order No. 4-2001, p. 9.) Thus, Kho would not have even come across it unless he first made his way all the way through the rest of the long, complex, legally technical wage order. In other words, this sentence, unlike the arbitration provision, truly is " ' "*hidden* within a prolix printed form." ' " (*Pinnacle*, *supra*, 55 Cal.4th at p. 247, italics added.)

The other wage order — which, again, did not exist during Kho's employment with OTO — is, in addition, similarly problematic. Though shorter, it comprises five sections of densely-packed, single-spaced, small font type; written in very technical legal jargon; containing both statutory references and references to other wage orders; setting forth exceptions to its application; and including complicated charts. (Wage Order No. MW-2019.) It makes no mention of the Berman procedure, either by name or by statutory reference, and contains no express reference to "wage-related violations." (Maj. opn., *ante*, at p. 22.) Instead, at the bottom, in tiny type, its states that "Questions about enforcement should be directed to the Labor Commissioner's Office." (Wage Order No. MW-2019.)

In short, the wage orders that, according to the majority, demonstrate the Berman procedure's superiority in terms of initiating action, demonstrate just the opposite. To the extent, if any, the arbitration agreement is problematic in the ways the majority asserts, the wage orders are more problematic in each of those ways. And they are problematic in additional ways that the majority does not even assert characterize the arbitration agreement.

In addition, the majority's assertion about only needing to "fill[] out a simple form" to initiate the Berman procedure (maj. opn., *ante*, at p. 21) is inaccurate. Upon examination, the form to which the majority refers turns out not to be so "simple" at all. (Maj. opn., *ante*, at p. 21.) It requires an employee to know and provide a considerable amount of detailed information, including: whether the claim is "about a public works project"; whether there is "a union contract covering [the] employment," in which case a copy should be attached; the "total number of [the employer's] employees"; and a complete breakdown of the unpaid amounts into "regular wages," "overtime wages," "meal period wages," "rest period wages," "split shift premium," "reporting time pay," "commissions," "vacation wages," "business expenses," "unlawful deductions," and "other." (DLSE, Initial Report of Claim (DLSE Form 1) (rev. July 2012).) This is far more information than is necessary to file a civil complaint. Indeed, unlike the majority, the DLSE recognizes that the claim initiation form is not so simple; with it, the DLSE offers two pages of densely-packed "Instructions for Filing A Wage Claim" and, attached to the instructions, a densely-packed, three-page "Guide to Completing 'Initial Report or Claim' Form (DLSE Form 1)."

Moreover, initiating the Berman procedure may actually require *more* than filling out that single form. Additional forms must be filled out and submitted "if the claim involves "commission pay" or "vacation wages," or "if the plaintiff's work hours or days of work varied per week or were irregular and the plaintiff is seeking unpaid wages or premium pay for meal or rest period violations." (DLSE Policies, *supra*, at p. 1.) Employees are also directed to submit a variety of other supporting documents — time records, paychecks and paystubs, bounced checks, notice of employment information — if they have them. (*Ibid.*) Given the above, the majority has exaggerated the ease of initiating the Berman procedure.

Sixth, the majority's discussion of how "[c]ollection . . . in the Berman context" is "simplified" compared to arbitration (maj. opn., *ante*, at p. 23) ignores aspects of arbitration that undermine its view. The majority emphasizes that where "the employer unsuccessfully appeals the Labor Commissioner's award, the claimant can collect on a posted bond." (Maj. opn., *ante*, at p. 24.) However, an employee who arbitrates a controversy may obtain provisional remedies — such as an attachment or a preliminary injunction *requiring payment of wages during the arbitration* — in connection with the controversy. (Code Civ. Proc., § 1281.8.) No comparable provision enables an employee actually to obtain any payment *during the Berman procedure.*

Seventh, the majority's discussion of the relative costs of arbitration and the Berman procedure is misleading and incomplete. According to the majority, by agreeing to arbitrate a wage claim, an employee gives up a "largely cost-free administrative procedure." (Maj. opn., *ante*, at p. 25.) But an employee who requests a subpoena for documents, records or

witnesses — as Kho did in this case — is responsible for the "[c]osts incurred in the service of a subpoena, witness fees and mileage." (DLSE Policies, *supra*, at p. 3.) And employees who file de novo appeals from awards by the Labor Commissioner must pay (1) a court filing fee (Lab. Code, § 98.2, subd. (a)) *and* (2) the employer's "costs and reasonable attorney's fees" if they fail to recover "an amount greater than zero" (*id.*, subd. (c)). In any event, as the majority correctly notes, the arbitration agreement "anticipates" that, consistent with *Armendariz*, OTO has the "obligation to pay arbitration-related costs." (Maj. opn., *ante*, at p. 18.) Thus, if there are any costs "unique to arbitration" under the agreement — such as costs incident to discovery, preparation of proper pleadings, and/or motion practice — then OTO must pay them. (*Armendariz*, *supra*, 24 Cal.4th at p. 113.) As the majority explains, this payment obligation "*mitigates the unfairness* of expecting that [Kho] bear costs of a procedure to which [he was] required to agree." (Maj. opn., *ante*, at p. 29, italics added.)

So it turns out that the majority's only real concern about costs relates to "[a]ttorney fees," which, says the majority, are "different" from other costs "because they are not unique to arbitration." (Maj. opn., *ante*, at pp. 26-27.) According to the majority, "employees can secure free legal assistance from the Labor Commissioner, both at the Berman hearing and in any subsequent appeal." (Maj. opn., *ante*, at p. 27.) By contrast, in the arbitration, they must "pay for [legal] representation." (*Ibid.*)

The majority's analysis is problematic for several reasons. First, to be clear, according to the majority, the commissioner may *not* provide an employee with "representation" by "a lawyer" at a Berman hearing (maj. opn., *ante*, at p. 27), because

"no statute authorizes" such representation (maj. opn., *ante*, at p. 27, fn. 13). Instead, in terms of providing "free legal assistance" (maj. opn., *ante*, at p. 27) at the Berman hearing, the commissioner only may "assist . . . with cross-examination and explain issues and terms involved" (maj. opn., *ante*, at p. 8). Second, as noted above, nothing in the arbitration agreement precludes the arbitrator from providing similar assistance, and the majority never asserts otherwise. Third, even as to de novo appeals, not all employees are *eligible* for legal representation by the commissioner, and even fewer are *absolutely entitled* to such representation. Employees who are "financially []able to afford counsel" are not eligible for representation by the commissioner. (Lab. Code, § 98.4.) If they are "financially unable to afford counsel," but are "objecting to any part of the Labor Commissioner's final order," they are eligible for representation, but the commissioner has discretion not to provide it. (*Ibid.*) Thus, employees requesting a trial de novo are *never guaranteed* representation by the commissioner, because they are, by definition, objecting to part of the final order; representation of such employees is always a matter for the commissioner's discretion. Only those employees who are *both* "financially unable to afford counsel" *and* "not objecting to any part of the Labor Commissioner's final order" are statutorily guaranteed representation by the commissioner. (*Ibid.*)

Fourth, the majority gives short shrift to OTO's claim that "the Labor Commissioner could represent claimants in arbitration." (Maj. opn., *ante*, at p. 27, fn. 13.) The majority states that "no statute authorizes the representation of [wage] claimants outside th[e] specific context" of de novo proceedings following a Berman hearing. (Maj. opn., *ante*, at p. 27, fn. 13.) However, Labor Code section 98.3, subdivision (a), states that

"[t]he Labor Commissioner may prosecute all actions for the collection of wages, penalties, and demands of persons who in the judgment of the Labor Commissioner are financially unable to employ counsel and the Labor Commissioner believes have claims which are valid and enforceable." The majority asserts that this statute only gives the commissioner "the power to prosecute its *own* action . . . on behalf of workers" (maj. opn., *ante*, at p. 27, fn. 13), but the statutory language on its face does not seem so confined, and the majority offers no analysis for its restrictive reading. Moreover, Labor Code section 98.3, subdivision (b), states that "[t]he Labor Commissioner may prosecute action for the collection of wages and other moneys payable to employees or to the state arising out of an employment relationship or order of the Industrial Welfare Commission." These provisions, and OTO's argument, merit more in depth and definitive consideration if, as the majority reasons, the asserted unavailability of free counsel in arbitration is the primary reason the arbitration agreement is substantively unconscionable.

Finally, the majority's comparison of the employee's ability to recover attorney fees in arbitration and in a Berman procedure is misleading. As noted above, the parties agree — and the majority does not dispute — that were Kho to hire counsel to assist in an arbitration and were he to prevail, as "to most of [his] claims," he would be entitled to "reasonable attorney fees and costs" under Labor Code section 218.5. (Maj. opn., *ante*, at p. 27.) Nevertheless, the majority continues, he "face[s] a risk that [he] will not be designated the prevailing party" under the fee statute. (Maj. opn., *ante*, at p. 28.) By contrast, the majority asserts, "The Berman statutes provide fee-shifting to wage claimants who secure *any* monetary

recovery in an employer's appeal." (Maj. opn., *ante*, at p. 28.) Of course, this means that claimants who recover *nothing* in an employer's appeal are *not* entitled to recover attorney fees. And the majority's use of the limiting phrase "in an employer's appeal" (*ibid.*) means that in an appeal *by the employee*, the employee may *not* recover attorney fees under *any* circumstances, *even upon securing full monetary recovery.* (*Sonic I, supra,* 51 Cal.4th at p. 673 [in de novo proceeding, "successful appellants may not obtain [attorney] fees"].) Moreover, appealing employees, even if "financially unable to afford counsel," are not guaranteed representation by the Labor Commissioner, because they would be "objecting to [some] part of the Labor Commissioner's final order." (Lab. Code, § 98.4.) In this respect, arbitration, by making attorney fees potentially available to employees even if they are appealing parties, is actually *more* accessible and affordable for employees.

The majority offers little response to my detailed analysis, other than to say I am simply "rais[ing] the same criticisms of the Berman procedure that [the majority] considered at length, and rejected" in *Sonic II*. (Maj. opn., *ante*, at p. 25, fn. 15.) Although *some* of the points I make here about the Berman procedure are the same as points I made in *Sonic II, many are not*. The majority simply ignores the points that are new. It also ignores *the evidence* I cite to refute its assessment of the Berman procedure, which is based solely on this court's assertions about what that procedure was, in theory " 'designed to provide.' " (Maj. opn., *ante*, at p. 7.)

Moreover, contrary to the majority's assertion, I am *not* making "criticisms" of the Berman procedure. (Maj. opn., *ante*, at p. 25, fn. 15.) I am simply pointing out relevant aspects of the Berman procedure that are inherent in the statutory provisions

themselves or that have revealed themselves through actual administration of those provisions. This level of detailed inquiry is necessary because of the basis for the majority's unconscionability finding: its assessment of the Berman procedure's benefits relative to those of the arbitration procedure. A proper evaluation of that finding requires close examination of the majority's assumptions and of any real, substantive differences between the two procedures. The court should not cavalierly invalidate this arbitration agreement based on erroneous assumptions or assertions about its procedures as compared to the Berman procedure. In light of the above considerations, it is impossible to reach a reliable, accurate, or definitive conclusion that the Berman procedure is less costly than the arbitration procedure. Given the uncertainties regarding such a comparison, the majority's analysis provides an insufficient basis for concluding that Kho has carried his burden to prove that the agreement was "unconscionable at the time it was made." (Civ. Code, § 1670.5, subd. (a).)

Of course, reasonable people may reach different conclusions about the inchoate value, at the time the arbitration agreement was signed, of a Berman procedure's potential benefits in comparison to the inchoate value of the arbitration procedure's potential benefits. But a court's after-the-fact, subjective assessment of the relative benefits of the two procedures should not be the basis for exercising the judicial power to declare that an agreement was "unconscionable at the time it was made" (Civ. Code, § 1670.5, subd. (a)), and thus unenforceable. This should be especially true where, as here, the basis for the court's conclusion is that the arbitration procedure is simply too much like a procedure — ordinary civil

litigation — that, according to the majority, has been "carefully crafted to ensure fairness to both sides." (Maj. opn., *ante*, at p. 25.)

Which brings me to my next point of disagreement with the majority: its view that our case law allows invalidation of this arbitration agreement based on the relative benefits of the arbitration procedure and the Berman procedure. To be sure, the majority in *Sonic II*, *supra*, 57 Cal.4th at page 1149, said that a court, "in determining whether an arbitration agreement is unconscionable," may "consider the value of benefits provided by the Berman statutes" that the employee has "surrender[ed]." However, the *Sonic II* majority also emphasized: that an "employee's surrender of such benefits does not necessarily make the agreement unconscionable" (*id.* at p. 1125); that a finding of substantive unconscionability may not be "premised on the superiority of the Berman hearing as a dispute resolution forum" (*id.* at p. 1149); that "the unconscionability doctrine does not mandate the adoption of any particular form of dispute resolution mechanism, and courts may not decline to enforce an arbitration agreement simply on the ground that it appears to be a bad bargain or that one party could have done better" (*id.* at p. 1148); that "[t]he unconscionability inquiry is not a license for courts to impose their renditions of an ideal arbitral scheme" (*ibid.*); that the party seeking to compel arbitration need not "justify the [arbitration] agreement through provision of benefits comparable to those otherwise afforded by statute" (*id.* at p. 1152); that "parties may opt out of the Berman process with any agreement that provides for accessible, affordable arbitration of wage disputes" (*id.* at p. 1168); that "[o]ur rule requires only that wage claimants have an accessible and affordable mechanism for dispute resolution, not that the

mechanism adopt any particular procedure or assume any particular form" (*id.* at pp. 1170-1171); and that "an adhesive arbitration agreement that compels the surrender of Berman protections as a condition of employment" (*id.* at p. 1150) is *enforceable* "so long as" it "provides employees with an accessible, affordable process for resolving wage disputes that does not 'effectively block[] every forum for the redress of [wage] disputes, including arbitration itself' " (*id.* at pp. 1157, 1158).

As noted earlier, the majority acknowledges that the features of the arbitration procedure here were "carefully crafted to ensure fairness to both sides" (maj. opn., *ante*, at p. 25) and are *not* "per se unfair" (maj. opn., *ante*, at p. 25), and the majority does not find that arbitration is so unaffordable or inaccessible for Kho as to effectively block every forum for redress. If the statements of the *Sonic II* majority have any meaning, then that should end the inquiry, and the arbitration agreement should be enforced. But the majority nevertheless invalidates the agreement because, in its view, the arbitration procedure is not *as* advantageous for Kho as the Berman procedure. In this regard, the majority's analysis and conclusion are inconsistent with the *Sonic II* majority's many statements and assurances regarding the enforceability of arbitration agreements in this context, especially its statement that a finding of substantive unconscionability may *not* be "premised on the [purported] superiority of the Berman hearing as a dispute resolution forum." (*Sonic II, supra*, 57 Cal.4th at p. 1149.)

The majority here essentially ignores the *Sonic II* majority's statements, proclaiming that "the question" here "[u]ltimately" is whether Kho "was coerced or misled into making an unfair bargain" that is too "one-sided" to be enforced.

(Maj. opn., *ante*, at p. 32.)  To be sure, the *Sonic II* majority stated that "courts may examine the terms of adhesive arbitration agreements to determine whether they are unreasonably one-sided."  (*Sonic II, supra,* 57 Cal.4th at p. 1145.)  But the *Sonic II* majority also stated that, with respect to claims that qualify for the Berman procedure, "arbitration conducted with many of the formalities of litigation is not unconscionably one-sided" if it provides "accessible and affordable resolution of wage disputes."  (*Id.* at p. 1163.)  And the *Sonic II* majority expressly "reaffirm[ed]" *Little*'s discussion on this point (*ibid.*), where we said "[i]t is not at all obvious" that provisions incorporating "legal formalities into" an arbitration agreement — i.e., "the rules of pleading and evidence" and "traditional judicial motions such as demurrer and summary judgment" — "would inordinately benefit [the employer] rather than [the employee]" (*Little, supra,* 29 Cal.4th at p. 1075, fn. 1). The majority's analysis and conclusion are inconsistent with these statements.

Finally, even were the majority correct that the agreement is one-sided with respect to claims covered by the Berman procedure — and as I have demonstrated, it is not — the majority's analysis is contrary to the *Sonic II* majority opinion's discussion of one-sidedness.  Consistent with my earlier discussion of basic contract law, the *Sonic II* majority stated that whether a contract is "unreasonably one-sided" must be determined based on "the overall bargain."  (*Sonic II, supra,* 57 Cal.4th at p. 1146.)  Thus, even were it true that the arbitration procedure provides Kho with little or no benefit with respect to claims covered by the Berman procedure, that would not mean the parties' " 'overall bargain' " was " 'one-sided,' " let alone " 'unreasonably one-sided.' " (Maj. opn., *ante,* at p. 11).  Only by

43

evaluating the arbitration agreement as if it were merely "a waiver of Berman procedures" (maj. opn., *ante*, at p. 11) and ignoring the overall benefits Kho received and the detriment OTO suffered — all in disregard of our precedents — can the majority assert that, given what Kho "received in return" for "surrender[ing] the full panoply of Berman procedures and assistance" (maj. opn., *ante*, at p. 32), the agreement is "so unfairly one-that it should not be enforced" (maj. opn., *ante*, at p. 11).

For all of the preceding reasons, the majority's analysis and conclusion are incorrect as a matter of state law.

## E. Federal Law — The FAA

The final reason I do not join the majority opinion is that its analysis is inconsistent with — and thus preempted by — the FAA, as the high court has construed that law.

The high court cases applying the FAA authoritatively establish at least two principles that are fatal to the majority's analysis and conclusion. First, an arbitration agreement's enforceability may *not* "turn[] on" a state's "judgment concerning the forum for enforcement of [a] state-law cause of action." (*Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 446 (*Buckeye*).) Thus, as the *Sonic II* majority stated, the FAA precludes a court from "finding an arbitration agreement unconscionable" based on "the fact that arbitration supplants an administrative hearing." (*Sonic II, supra*, 57 Cal.4th at p. 1146.) Second, judges may not declare an arbitration agreement to be unenforceable based on their subjective view that the arbitration procedure would not provide " 'effective vindication' " of a statutory right, unless the agreement goes so far as to "forbid[] the assertion of certain

statutory rights," and "perhaps" if it imposes "filing and administrative fees . . . that are so high as to make access to the forum impracticable." (*American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. __, __ [133 S.Ct. 2304, 2310-2311] (*Italian Colors*).)

The majority's analysis and conclusion violate both of these binding FAA principles. Again, the majority, though recognizing that the arbitration procedure here was "carefully crafted to ensure fairness to both sides" (maj. opn., *ante*, at p. 25) and is not "per se unfair," unaffordable, or inaccessible (*ibid.*), nevertheless invalidates the arbitration agreement based on its view that the procedure is not as advantageous for Kho and other employees as the Berman procedure. In other words, contrary to high court precedent, the majority makes the agreement's enforceability "turn[] [entirely] on" a state court's "judgment" that the Berman procedure provides a better "forum for enforcement of [a] state-law cause of action" (*Buckeye*, *supra*, 546 U.S. at p. 446), and that the arbitration procedure "supplants" that more advantageous "administrative" forum (*Sonic II*, *supra*, 57 Cal.4th at p. 1146). Also contrary to high court precedent, the majority expressly has rested its conclusion on the view that the arbitration procedure, as compared to the Berman procedure, "erect[s] . . . barriers to the vindication of [employees'] statutory rights." (Maj. opn., *ante*, at p. 27.) Under binding high court case law, the FAA does not permit invalidation of the arbitration agreement on these grounds.

It is true that under the FAA, enforcement of an arbitration agreement is subject to "such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) It is also true that under this clause — which is known as the saving clause — unconscionability, as a " 'generally applicable

contract defense[],' " may be the basis for declining to enforce an arbitration agreement. (*Concepcion*, *supra*, 563 U.S. at p. 339.)

However, the FAA imposes substantial limits on what a court may do in the name of unconscionability. To begin with, "[a] court may not . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law." (*Perry v. Thomas* (1987) 482 U.S. 483, 493, fn. 9 (*Perry*).) Nor may a court apply the unconscionability doctrine "in a fashion that disfavors arbitration" or " 'rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable.' " (*Concepcion*, *supra*, 563 U.S. at p. 341.) In short, the saving clause "establishes an equal-treatment principle: A court may invalidate an arbitration agreement based on 'generally applicable contract defenses' like fraud or unconscionability, but not on legal rules that 'apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.' " (*Kindred Nursing Centers Ltd. Partnerships v. Clark* (2017) __ U.S. __, __ [137 S.Ct. 1421, 1426] (*Kindred Nursing*).) As this court has explained, this equal treatment principle mandates that our unconscionability standard "be . . . the same for arbitration and nonarbitration agreements" (*Sanchez*, *supra*, 61 Cal.4th at p. 912) and that we enforce our unconscionability rules "evenhandedly" (*Sonic II*, *supra*, 57 Cal.4th at p. 1143). It preempts any rule of unconscionability that "discriminat[es] on its face against arbitration." (*Kindred Nursing*, at p. 1426.)

But the equal treatment principle extends beyond overt discrimination, "displac[ing] any [state] rule [of unconscionability] that covertly accomplishes the same objective" (*Kindred Nursing*, *supra*, __ U.S. at p. __ [137 S.Ct. at

p. 1426]) or that employs "more subtle methods" to "target arbitration" (*Epic Systems Corp. v. Lewis* (2018) __ U.S. __, __ [138 S.Ct. 1612, 1622] (*Epic*)). Thus, as this court has explained, the FAA "preempts even a 'generally applicable' state law contract defense if that defense (1) is 'applied in a fashion that disfavors arbitration' [citation], or (2) 'interferes with fundamental attributes of arbitration' [citation], such as ' "lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." ' " (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 964 (*McGill*).) In other words, although the FAA's "saving clause preserves generally applicable contract defenses," it does not "preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." (*Concepcion, supra*, 563 U.S. at p. 343). Nor does it permit state courts, in "addressing the concerns that attend contracts of adhesion," "to take steps" under the rubric of unconscionability that "conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms." (*Id.* at p. 347, fn. 6.) Thus, "[t]he 'grounds' " for invalidating an arbitration agreement that the saving clause preserves do not " 'include a State's mere preference for procedures that are incompatible with arbitration and that "would wholly eviscerate arbitration agreements." ' " (*Id.* at p. 343.)

By refusing to enforce the arbitration agreement based on its view that the arbitration procedure is less advantageous for Kho and other employees than the Berman procedure, the majority runs afoul of these governing principles. Given the majority's recognition that the arbitration procedures have been "carefully crafted to ensure fairness to both sides" (maj. opn., *ante*, at p. 25), and are not "per se unfair," unaffordable, or

inaccessible (maj. opn., *ante*, at p. 25), the majority's "comparative benefit" basis for invalidating the agreement constitutes nothing more than a " 'mere preference' " for the " 'procedures' " prescribed by the Berman statutes. (*Concepcion, supra*, 563 U.S. at p. 343.) By insisting that the arbitration agreement have more features comparable to those of the Berman procedure, the majority is "frustrat[ing]" the FAA's "purpose to ensure that private arbitration agreements are enforced according to their terms." (*Id.* at p. 347, fn. 6.) The majority's effort to disguise this obvious preference for the Berman procedure under the cloak of unconscionability does not render its analysis and conclusion valid under the FAA; as explained above, the FAA's equal treatment principle extends beyond overt discrimination, "displac[ing] any [state] rule [of unconscionability] that covertly accomplishes the same objective" (*Kindred Nursing, supra*, __ U.S. at p. __ [137 S.Ct. at p. 1426]) or employs "more subtle methods" to "target arbitration" (*Epic, supra*, __ U.S. at p. __ [138 S.Ct. at p. 1622]).

But the majority's effort is perhaps not as subtle or covert as it might at first appear. The high court, in discussing the " 'great variety' of 'devices and formulas' " that judges hostile to arbitration have used to invalidate arbitration agreements, has expressly "not[ed] that California's courts have been more likely to hold contracts to arbitrate unconscionable than other contracts." (*Concepcion, supra*, 563 U.S. at p. 342.) Any reader of this court's opinions would surely be able to confirm the high court's observation. Any such reader would also be able to discern that the unconscionability analysis and contract principles this court applies in arbitration cases — including the majority's "comparative benefit" rationale for invalidating the arbitration agreement here, its insistence that there be *separate*

consideration for Kho's agreement to arbitrate claims covered by the Berman procedure, its failure to consider the parties' *overall* bargain and the detriment OTO suffered in determining what Kho received in return for his agreement to arbitrate, and its reliance on factors to find procedural unconscionability that our precedents hold are *not* factors — are indeed very different from the analysis and principles the court applies in nonarbitration cases.

Indeed, a majority of this court long ago expressly announced that with respect to arbitration agreements, it would apply "the ordinary principles of unconscionability . . . in forms peculiar to the arbitration context." (*Armendariz, supra*, 24 Cal.4th at p. 119.) Here, the majority again explicitly acknowledges that the "approach" it uses in "evaluating" the unconscionability of "compelled arbitration of wage claims" otherwise subject to the Berman procedure is "different" from the approach this court uses in evaluating other unconscionability claims. (Maj. opn., *ante*, at p. 25.) This unique, Berman-specific approach — and the majority's analysis and conclusion in this case — violate, and are thus preempted by, the FAA and its equal treatment principle, which preclude a court from "constru[ing an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law" (*Perry, supra*, 482 U.S. at p. 493, fn. 9), from applying the unconscionability doctrine "in a fashion that disfavors arbitration," and from " 'rely[ing] on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable' " (*Concepcion, supra*, 562 U.S. at p. 341). As this court has held, the FAA's equal treatment principle mandates that our unconscionability standard "be . . . the same

for arbitration and nonarbitration agreements" (*Sanchez*, *supra*, 61 Cal.4th at p. 912) and that we enforce our unconscionability rules "evenhandedly" (*Sonic II*, *supra*, 57 Cal.4th at p. 1143). In this case, the majority, once again, fails to heed this court's own pronouncements.

Moreover, this case confirms my view, as set forth in *Sonic II*, that the unique unconscionability analysis a majority of this court applies to compulsory arbitration of Berman claims is incompatible with, and therefore preempted by, the FAA for another reason: it " ' "stand[s] as an obstacle to the accomplishment and execution of [Congress's] *full purposes and objectives*" ' in passing the FAA." (*Sonic II*, *supra*, 57 Cal.4th at p. 1187 (conc. & dis. opn. of Chin, J.).) In *Italian Colors*, *supra*, 570 U.S. __ at pages __, __ [133 S.Ct. 2304, 2311-2312], the high court rejected an approach that would " 'require courts to proceed case by case to tally the costs and burdens to particular plaintiffs in light of their means' " and " 'the size of their claims.' " "Such a preliminary litigating hurdle," the court explained, "would undoubtedly destroy the prospect of speedy resolution that arbitration in general and bilateral arbitration in particular was meant to secure. The FAA does not sanction such a judicially created superstructure." (*Id.* at p. __ [133 S.Ct. at p. 2312].) As I explained in *Sonic II*, the unconscionability inquiry the *Sonic II* majority set forth — by requiring a "minitrial" in superior court "on the comparative costs and benefits of arbitration and the Berman procedure for a particular employee" and possible "appellate review of the trial court's decision" — creates "the very type of 'superstructure' " that, according to the high court, "the FAA prohibits." (*Sonic II*, at p. 1188 (conc. & dis. opn. of Chin, J.).)

In rejecting my view, the *Sonic II* majority confidently responded that its approach would "not erect a 'preliminary litigating hurdle' of the sort prohibited by *Italian Colors*." (*Sonic II, supra,* 57 Cal.4th at p. 1167.) To support its view, the majority asserted that a wage claim "is simpler than the antitrust claim at issue in *Italian Colors*," that courts "have routinely decided whether arbitration is affordable in a given case," and that applicable statutes would facilitate "summary" disposition of unconscionability claims. (*Id.* at p. 1157.)

The facts and the majority's conclusion in this case validate my analysis. OTO moved to compel arbitration in August 2015. The trial court denied the motion four months later, in December 2015. OTO then appealed, and in August 2017 — *two years after OTO moved to compel arbitration* — the Court of Appeal disagreed with the trial court and ordered the motion granted. Now, *after another two years of litigation*, a majority of this court is reversing the Court of Appeal based on a different assessment of the arbitration procedure's benefits relative to a Berman procedure. Thus, as the majority acknowledges, the "[l]itigation" in this case just to apply *Sonic II*'s unique unconscionability test *has "consumed . . . four years."* (Maj. opn., *ante,* at p. 24, fn. 12, italics added.) Even still, says the majority, its decision does *not* settle the question of whether an *identical* arbitration agreement would be enforceable "under less coercive circumstances." (Maj. opn., *ante,* at p. 32.) The length of this litigation and the majority's case-specific limitation on its holding confirm my view that the unconscionability analysis this court has prescribed for agreements to arbitrate claims the Berman procedure covers creates a preliminary litigating hurdle that, according to *Italian Colors*, is incompatible with, and thus preempted by, the FAA.

51

The majority's response — that this inordinate delay in arbitration is permissible under the FAA because unconscionability is a generally applicable contract defense that "has long been recognized as a permissible ground for invalidating arbitration agreements under the FAA's savings clause" (maj. opn., *ante*, at p. 34) — is simply incorrect. Under high court precedent, the unconscionability defense does *not* "qualify for protection under the saving clause" if it is applied so as to "interfere[] with a fundamental attribute of arbitration." (*Epic*, *supra*, __ U.S. at p. __ [138 S.Ct. at p. 1622].) Consistent with this precedent, we unanimously stated just two years ago that the FAA "preempts *even a 'generally applicable' state law contract defense* if that defense . . . 'interferes with fundamental attributes of arbitration,'" including "' "lower costs [and] greater efficiency and speed." ' " (*McGill*, *supra*, 2 Cal.5th at p. 964, italics added.) Because the extended litigation made necessary by a majority of this court's unique approach to unconscionability in the Berman waiver context substantially interferes with these fundamental attributes of arbitration, the FAA preempts that approach notwithstanding the fact that unconscionability is otherwise a generally applicable contract defense.[6]

---

[6] The majority's other response — that this case is atypical because "[f]ew cases progress to appeal, and vanishingly few reach this court" (maj. opn., *ante*, at p. 34) — ignores (1) the cost and delay attributable to the superior court proceedings, and (2) the fact that between 10,000 and 15,000 appeals are filed in our Courts of Appeal each year. (Jud. Council of Cal., 2017 Court Statistics Report, Statewide Caseload Trends: 2006-2007 Through 2015-2016, p. 48.)

The majority opinion here also confirms another aspect of my FAA preemption analysis in *Sonic II*. There, I explained that the *Sonic II* majority's unconscionability analysis is "inconsistent with" the FAA, as the high court construed it in *Southland*, because it "is not a ground that exists at law or in equity for the revocation of *any* contract, but is . . . merely a ground that exists for the revocation of arbitration provisions in contracts subject to the Berman statutes or to other statutes that 'legislatively' afford to 'a particular class . . . specific protections in order to mitigate the risks and costs of pursuing certain types of claims.'" (*Sonic II*, *supra*, 57 Cal.4th at p. 1190 (conc. & dis. opn. of Chin, J.).) Consistent with my analysis, the majority, in finding unconscionability here, concedes that it is using "a different approach in evaluating the compelled arbitration of wage claims, as compared to the arbitration of other types of disputes." (Maj. opn., *ante*, at p. 25.) That approach, the majority continues, is not appropriate for "wrongful demotion and discharge" claims because "[t]here is no Berman-like administrative process for" such claims (maj. opn., *ante*, at p. 25) and no provision for "free legal assistance" (*id.* at p. 27) as there is with the Berman procedure; "[w]hile all employees would likely benefit from having a lawyer in the litigation-like arbitration process here," "wage claimants present a somewhat special case" because "only [they] have to pay for representation that was otherwise available to them for free" (*ibid.*). Thus, although arbitration with "litigation-like procedures" is permissible for some employment claims, it is unacceptable as a "substitute for [the Berman] administrative procedure." (Maj. opn., *ante*, at p. 16.) These statements reinforce the view I stated in *Sonic II*: This court's rule of unconscionability for agreements requiring arbitration of

unpaid wage claims otherwise eligible for the Berman procedure is "inconsistent with" the FAA because it "is not a ground that exists at law or in equity for the revocation of *any* contract, but is . . . merely a ground that exists for the revocation of arbitration provisions in contracts subject to the Berman statutes.'" (*Sonic II*, *supra*, at p. 1190 (conc. & dis. opn. of Chin, J.).)

Under the FAA, "[p]arties may generally shape [arbitration] agreements to their liking by specifying with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes. [Citation.] Whatever they settle on, the task for courts and arbitrators at bottom remains the same: 'to give effect to the intent of the parties.'" (*Lamps Plus*, *Inc. v. Varela*, *supra*, __ U.S. at p. __ [139 S.Ct. at p. 1416].)

California law embodies a similar principle; as this court has explained, by enacting the California Arbitration Act, "the Legislature has determined that the parties shall have considerable leeway in structuring the dispute settlement arrangements by which they are bound . . . ." (*Graham*, *supra*, 28 Cal.3d at p. 825.) This "leeway . . . permit[s] the establishment of arrangements which vary to some extent from the dead-center of 'neutrality,'" so long as they meet "certain 'minimum levels of integrity.'" (*Ibid.*) In light of the public policy strongly favoring arbitration, those arrangements should be enforced — and "the matter should be permitted to proceed to arbitration" — absent a "clear[]" showing that they "essentially preclude the possibility of a fair hearing." (*Id.* at p. 826, fn. 23.) "If, in the course of arbitration proceedings, the resisting party is actually denied a fair opportunity to present

his position, ample means for relief are available through a subsequent petition to vacate the award." (*Ibid.*)

The majority violates these federal and state law principles by invalidating the arbitration rules to which the parties in this case agreed — even though those rules have been "carefully crafted to ensure fairness to both sides" (maj. opn., *ante*, at p. 25) and do not make arbitration "per se unfair," unaffordable, or inaccessible (*ibid*.) — because they are not, in the majority's view, as advantageous for Kho as the Berman procedure.  This conclusion is both inconsistent with California law and preempted by the FAA.

For the foregoing reasons, I dissent.

**CHIN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** OTO, L.L.C. v. Kho

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 14 Cal.App.5th 691
**Rehearing Granted**

_____

**Opinion No.** S244630
**Date Filed:** August 29, 2019

_____

**Court:** Superior
**County:** Alameda
**Judge:** Evelio M. Grillo

_____

**Counsel:**

Fine, Boggs & Perkins, John P. Boggs and Roman Zhuk for Plaintiff and Appellant.

Fisher & Phillips, Wendy McGuire Coats and Katherine P. Sandberg for California New Car Dealers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Fernando Flores, Miles E. Locker and Theresa Bichsel for Intervener and Appellant.

Weinberg, Roger & Rosenfeld, David A. Rosenfeld, Caren P. Sencer and Caroline N. Cohen for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John P. Boggs
Fine, Boggs & Perkins
80 Stone Pine Road, Suite 210
Half Moon Bay, CA  94019
(650) 712-8909

Miles E. Locker
Division of Labor Standards Enforcement
Department of Industrial Relations
455 Golden Gate Avenue, 9th Floor
San Francisco, CA  94102
(415) 703-4863

David A. Rosenfeld
Weinberg, Roger & Rosenfeld
1001 Marina Village Parkway, Suite 200
Alameda, CA  94501
(510) 337-1001